In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2564

Tuhran A. Lear,

Petitioner-Appellant,

v.

Roger D. Cowan, Warden,

Respondent-Appellee.


Appeal from the United States District Court
for the Southern District of Illinois.
No. 97 C 826--J. Phil Gilbert, Chief Judge.


Argued February 17, 2000--Decided March 21, 2000
Amended, and Petition for Rehearing
and for Rehearing En Banc Denied, July 13, 2000/*


   Before Posner, Chief Judge, and Easterbrook and Evans,
Circuit Judges.

   Posner, Chief Judge.  Lear was sentenced to death
by an Illinois state court, and after exhausting
state remedies, see People v. Lear, 572 N.E.2d
876 (Ill. 1991), 677 N.E.2d 895 (Ill. 1997),
appeals to us from the denial of his petition for
federal habeas corpus. The district court
analyzed the issues fully and competently, and we
have very little to add.

   Lear and a companion, Randy Thomas (who was
tried separately presumably because they had
antagonistic defenses, see, e.g., Hernandez v.
Cowan, 200 F.3d 995, 999 (7th Cir. 2000), was
convicted of felony murder, and was sentenced to
prison for 60 years), entered the shop at a
gasoline station in rural Illinois. Two employees
were on the premises, Bob Bishop and Gregory
McAnarney. According to Bishop's testimony, Lear
walked past him toward the restroom while Thomas
engaged him in conversation. While they were
talking, Bishop was shot in the neck from behind,
obviously by Lear if Bishop was face to face with
Thomas. Bishop fell to the floor and feigned
death, and while lying there heard another shot--
the shot that killed McAnarney--and felt someone
remove his (Bishop's) wallet from his pocket.
Shortly afterward, with Bishop and McAnarney

lying where they had fallen, a customer entered the store, but when she saw what had happened she quickly began to leave. Lear told her to stay, displaying a gun in his waistband. But she sensibly retreated, and though followed by Lear managed to get back to her car. Her boyfriend, who was in the driver's seat waiting for her to return, drove away, followed by Lear in a van; he was shortly arrested by the state police, the boyfriend having called the police on his CB radio. The arresting officer searched the van and found shell casings and the gun that had been used to shoot McAnarney and Bishop, and in Lear's pocket found McAnarney's wallet. The officer also saw blood on Lear's shoe. The prosecution speculated that the blood was McAnarney's (though it was never tested) and had gotten on Lear's shoe when Lear, having shot McAnarney, removed his wallet. However, only Thomas's fingerprints were found on the gun.

Lear's principal argument is that his Sixth Amendment right to present a defense (e.g., United States v. Scheffer, 523 U.S. 303, 308 (1998); Smith v. Kolb, 950 F.2d 437, 440 (7th Cir. 1991)) was violated by the trial court's refusal to allow him to call as a witness a reporter who had discussed the murder and robbery with Bishop shortly after the event and who in an article that she had written about it (but that we can't find) for a local newspaper had reported Bishop's telling her that the taller of the two robbers, who would have been Thomas, had entered the store first. Yet at the trial Bishop testified that Lear had entered first. When cross-examined about this discrepancy, Bishop admitted that while he didn't remember the exact words he had used to the reporter, probably he had told her that the taller robber had entered first.

Eliding such questions much discussed in the briefs as whether every ruling that erroneously excludes impeaching evidence violates the Constitution and what the correct standard of review of such a ruling is in a federal habeas corpus proceeding governed by the Antiterrorism and Effective Death Penalty Act, we think it plain that there was no error. To impeach is to contradict; so if a witness for one party, in this case the state, admits the proposition that the opposing party wants to prove, there is nothing to impeach. United States v. Rosa, 11 F.3d 315, 336 (2d Cir. 1993); People v. Alexander, 470 N.E.2d 1071, 1079 (Ill. App. 1984). While not recalling his exact words, Bishop admitted having told the reporter, contrary to his direct testimony, that the taller robber (therefore Thomas, not Lear) had entered the store first. The jury could thus weigh the

significance of the contradiction between what Bishop had told the reporter and what he testified to at the trial. The significance was slight. Bishop was positive that it was Thomas who had engaged him in conversation, meaning that Lear must have shot him and, given the quick succession of shots, McAnarney as well. It didn't matter who entered the store first; obviously Thomas could have entered first yet tarried at the front while Lear went behind Bishop.

Even if Bishop had denied ever telling anyone that the taller of the robbers had entered first, Lear would have had no right to call the reporter to contradict him. He could not have justified calling her to cast a general doubt on Bishop's veracity concerning any material issue relating to Lear's guilt. For Lear does not contend that Bishop may have been lying, that he pretended to be shot, that he shot himself, that he shot McAnarney and then himself, that he may have been shot by someone other than Lear or Thomas, or that anything else might have happened that would exculpate Lear. The only contention is that Bishop may have been mistaken about which of those two shot him. But that mistake would have been irrelevant to guilt, since each was guilty of and convicted of felony murder, the murder having been committed in the course and furtherance of the robbery. 720 ILCS 5/9-1(a)(3); People v. Smith, 701 N.E.2d 1097, 1100 (Ill. 1998). Impeachment evidence that lacks even oblique relevance to the question of the defendant's guilt is irrelevant and therefore inadmissible--at least on the subject of guilt. For evidence irrelevant at the guilt phase of a trial may be relevant at the sentencing phase-- especially in a case in which a capital defendant is convicted of felony murder, because the Supreme Court has held that a felony murderer can be executed only if he killed or intended to kill the murder victim. Hopkins v. Reeves, 524 U.S. 88, 99-100 (1998); Loving v. United States, 517 U.S. 748, 755-56 (1996); Enmund v. Florida, 458 U.S. 782, 801 (1982). Lear might therefore have had an argument for calling the reporter as a witness at the sentencing hearing. But this argument is thoroughly waived, having been raised for the first time at oral argument--and by one of the judges.

Lear also argues that his trial lawyer rendered ineffective assistance to him by failing to take advantage of Turner v. Murray, 476 U.S. 28, 36-37 (1986), which holds that "a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." (McAnarney was white, as is Bishop; Lear is black, as is Thomas.) We must ask whether this

omission brought the lawyer's representation of Lear below minimum professional standards, and if so whether it is likely that the jury would not have imposed the death penalty. The Supreme Court made clear in Turner that the lawyer's failure to have the jurors informed of the victim's race and questioned about their feelings about interracial crime is not unprofessional, subpar representation per se. Id. at 37. Indeed, all the Court really held was that if the defense wants to quiz jurors on their reaction to the interracial character of the defendant's crime, the judge must permit this. Obviously there are tactical reasons why a lawyer would not want to direct the jurors' attention to the interracial character of the crime, and the Court recognized this. Id. Lear's lawyer testified that he thought he had dealt with the issue adequately by asking general questions about bias without focusing on race. Asking general questions about bias may have been a better method of eliciting reactions to the interracial character of the crime than playing up the interracial issue, especially since there is no suggestion that the crime had a racial motive. We are given no reason to doubt that the lawyer made the best tactical choice available to him in the tough circumstances that confronted him: a brutal murder and no real defense. We grant that if Lear had asked his lawyer to raise the racial issue, and if the lawyer had refused without explanation, this would strengthen Lear's claim of ineffective assistance of counsel; but that did not happen either. There is, in short, no reason to think counsel was ineffective. In any event no harm has been shown; it is exceedingly unlikely that directing the venire's attention to the interracial character of Lear's conduct would either have disposed the jury that was selected to lenity or have altered the composition of the jury in a direction favorable to him.

The only other matter that warrants discussion is Lear's claim to be entitled by the Eighth Amendment to the aid of a "mitigation specialist" who before the sentencing hearing in a capital case would conduct a thorough investigation of the defendant's past in an effort to develop evidence in mitigation of the case for capital punishment. All other objections to making such a claim the basis for a constitutional right assertable in a federal habeas corpus proceeding to one side, its denial here was harmless. See Britz v. Cowan, 192 F.3d 1101, 1104 (7th Cir. 1999); Stewart v. Gramley, 74 F.3d 132, 135-36 (7th Cir. 1996); Bolender v. Singletary, 16 F.3d 1547, 1561 (11th Cir. 1994). The evidence in aggravation of Lear's offense was compelling, consisting of his having committed two other murders. The evidence that his current counsel

and their mitigation specialist have dug up shows only (beyond what little was presented to the jury at the sentencing phase of his trial) that Lear was a good student and (contradictorily) has a somewhat below-average IQ, that he used cocaine, that he's neurotic, and that he has an "antisocial personality disorder" or a "characterological disorder of the asocial type," which strikes us as fancy language for being a murderer. It is exceedingly unlikely that this additional evidence would have swayed any member of the jury against sentencing Lear to death, given those two prior murders and considering the entirely gratuitous character of McAnarney's murder and of the near murder of Bishop shot in cowardly fashion from behind while his attention was being distracted by the accomplice.

Affirmed.

/* None of the judges on the original panel voted to rehear the case. Judges Ripple, Rovner, Diane P. Wood, and Williams voted to rehear the case en banc. Judges Rovner and Williams have written dissenting opinions; each has joined the other's opinion and Judge Wood has joined both opinions. Judge Ripple has not joined either opinion.

ROVNER, Circuit Judge, with whom DIANE P. WOOD and WILLIAMS, Circuit Judges, join, dissenting from the denial of rehearing en banc. The Lear opinion mischaracterizes Turner v. Murray, 476 U.S. 28 (1986), in several fundamental ways, transforming the prophylactic inquiry it prescribes from an essential tool for ensuring the impartiality of a jury into a discretionary inquiry that may do more harm than good and presumptively would not alter the outcome anyway. Because that interpretation is inconsistent with the plain language of Turner and the reality of juries today, I dissent from the denial of rehearing en banc.

According to the Lear panel, Turner merely held that a defendant has the option of quizzing the jurors on their reaction to the interracial nature of the crime. If the defense counsel fails to question jurors about the interracial nature of the crimes but asks general questions about bias, we may excuse it as a tactical decision and find no deficient performance. Moreover, even if we decide an attorney did perform deficiently in failing to ask those questions, we need not find

ineffective assistance because we will presume that there was no prejudice given that "it is exceedingly unlikely that directing the venire's attention to the interracial character of Lear's conduct would either have disposed the jury that was selected to lenity or have altered the composition of the jury in a direction favorable to him." Ante at 6. In other words, the Lear panel sees little utility in the Turner inquiry, and thus no harm if it is forfeited. The Supreme Court, however, thought otherwise, as even a cursory glance at Turner reveals. Lear renders Turner a nullity.

Turner held that "a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." 476 U.S. at 36-37. The right is no mere formality; it exists because there is an "unacceptable risk of racial prejudice infecting capital sentencing" in cases of interracial crime, that may be easily avoided through proper questioning of prospective jurors. Id. at 36; see also id. at 40-41. In a footnote which is the focus of the Lear panel, the Turner majority addressed Justice Powell's concern in dissent that such questioning might have the negative effect of suggesting to jurors that race is somehow relevant. Id. at 37 n.10. In response to that concern, the Court declared that it would leave it up to a capital defendant's counsel whether such a concern is "purely chimerical" or not, and that a court was not required to ask such questions sua sponte should a defense counsel decline to do so. Id. That acknowledgment that some defense counsel at some point in time might deem the danger of raising the issue real rather than fantastical is hardly an endorsement that the inquiry may be forfeited without consequence. The entire focus of the Turner opinion is that racial biases may affect the determination of a sentence by a capital jury in an interracial crime. Unfortunately, the problem of racism in our society remains prevalent today. Turner's recognition that the danger of racism infecting the capital sentencing decision is greater in the case of interracial crimes than in crimes in which the victims are the same race is as well-grounded in reality today as it was in 1986.

The Lear panel, however, takes that one reference to the ability of defense counsel to decline such questioning as an invitation for us to supply possible tactical reasons why a particular defense counsel in fact failed to do so. The only basis given for the panel's conclusion that the omission was tactical is the defense counsel's statement that he had explored

the issue of racial prejudice with a general bias question. In his post-conviction affidavit, Lear's defense counsel addressed this issue, stating that he "asked the [potential] jurors whether there was anything about Mr. Lear that would cause them to be biased or prejudiced and my purpose in asking that question was to address the issue of racial prejudice, as Mr. Lear was black." Even assuming--as Lear's defense counsel believed--that this would cause jurors to "volunteer" racial prejudices (a rather generous assumption), it does nothing to ferret out prejudices related to the interracial nature of the crime. And that is what Turner addresses. In fact, the court in Turner had also asked general questions designed to uncover bias, and that was not enough. Id. at 49 (Powell, J. dissenting). Turner does not address prejudices based only on the race of the defendant. It instead recognizes the unacceptable risk of racial prejudice infecting the capital sentencing proceeding where the crimes involved interracial violence. For that reason, it holds that the defendant is entitled to inform potential jurors of the race of the victim. In the same affidavit, Lear's defense counsel attested that he "had no reason for not asking a question of the venire on voir dire whether the race of the victim would be a factor in causing them to be biased or prejudiced against Mr. Lear." On the critical Turner issue, that addressing the interracial nature of the crime, the lawyer has provided no tactical explanation. Lear's defense counsel has never even acknowledged an awareness of the right to a Turner inquiry. Absent knowledge that the right exists, it is impossible to consider the waiver of that right a "tactical" decision. Thus, the Lear panel mischaracterizes Turner by essentially presuming that a decision is tactical unless the facts indicate otherwise, rather than assuming the inquiry is necessary absent a reasoned decision to forego it. That turns Turner, not to mention Strickland, on its head.

This problem is further exacerbated by the curious contention that the ineffective assistance claim would be stronger if the defendant had asked his attorney to make the inquiry. I cannot comprehend how the determination of deficient performance can vary based on the defendant's knowledge of his legal rights and his conduct in requesting that his attorney exercise those rights. An attorney's obligation to her client does not change based upon the client's legal savvy. That proposition grafts onto the traditional Strickland analysis an unprecedented preliminary inquiry into whether the defendant first requested that his attorney assert his rights. That additional inquiry is irrelevant to the ineffective assistance issue,

and should be rejected by this court.

Finally, the most egregious error by the Lear panel is its determination that there is no prejudice. That holding is not grounded on any particular facts presented here, but on a presumption that it is "exceedingly unlikely" that such an inquiry would have either disposed the jury to lenity or favorably altered the composition of the jury. Of course, this is precisely the opposite of the presumption set forth in Turner, which held:

Our judgment in this case is that there was an unacceptable risk of racial prejudice infecting the capital sentencing proceeding. This judgment is based on a conjunction of three factors: the fact that the crime charged involved interracial violence, the broad discretion given the jury at the death-penalty hearing, and the special seriousness of the risk of improper sentencing in a capital case.

476 U.S. at 37 (Justices White, Blackmun, Stevens & O'Connor); see also id. at 41 (Justice Brennan, concurring in part and dissenting in part, agreeing that the confluence of factors created an unacceptable risk of a biased jury), and id. at 45 (Justice Marshall, concurring in part and dissenting in part). All three of those factors are present here, and that was sufficient for the Turner Court to find an unacceptable risk that the jury was not impartial absent the questioning on the issue. In fact, "Turner explicitly rejected the dissent's suggestion that the death sentence should stand because no actual jury prejudice was evident from the record." Rose v. Clark, 478 U.S. 570, 587 n.2 (1986) (Stevens, J. concurring). The Lear panel's presumption that the Turner questioning would have no impact on the ability to achieve an impartial jury cannot be reconciled with Turner.

Justice Powell in his Turner dissent lamented that "[b]efore today the facts that a defendant is black and his victim was white were insufficient to raise 'a constitutionally significant likelihood that, absent questioning about racial prejudice,' an impartial jury would not be seated." The Lear panel has answered his lament by adopting his dissent. After Lear, at least in the Seventh Circuit, the fact that a defendant is black and his victim was white is now insufficient to raise a constitutionally significant likelihood that, absent questioning about racial prejudice, an impartial jury would not be seated. Because this eviscerates Turner, I dissent from the denial of rehearing en banc.

Williams, Circuit Judge, with whom Rovner and Diane P. Wood, Circuit Judges, join, dissenting from the denial of rehearing en banc. I respectfully dissent from the denial of the petition for rehearing en banc because this case presents an issue of exceptional importance with respect to Petitioner's ineffective assistance of counsel claim that he premised on Turner v. Murray, 476 U.S. 28 (1986). Turner holds that "a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." Id. at 36-37. The Illinois Supreme Court, in construing Turner, rejected Petitioner's claim in part because he did not ask his lawyer to question prospective jurors about racial bias. In Turner, however, Justice White, writing for a majority of justices, only indicated that the court need not make the inquiry sua sponte if it is not requested by the defendant's counsel. See id. at 37 n.10. Based on my reading, Turner does not stand for the proposition that a capital defendant himself must demand the inquiry into racial bias. Instead, the defendant's counsel is expected to make the request for the defendant, and his failure to do so must be analyzed under the traditional test set forth in Strickland v. Washington, 466 U.S. 668, 688-94 (1984). The Illinois Supreme Court misapprehended the Turner holding by preliminarily determining whether Petitioner first requested that his lawyer assert his Turner rights. A lay defendant should not have to bear the obligation to protect his own constitutional right to an impartial jury when represented by counsel, and we should not tolerate this material misapprehension of Turner.

Turning to the Strickland test, the Illinois Supreme Court ultimately concluded that counsel's failure to make a Turner inquiry was a matter of trial strategy and the panel endorsed that determination. In order for counsel's decision to be "strategic," in my view, counsel must have at least been aware of Petitioner's entitlement to a Turner inquiry and consciously decided to ask "general questions about bias without focusing on race." I am unconvinced by the record that counsel's failure to make a Turner inquiry was indeed strategic. To be sure, the record lacks sufficient facts to suggest that counsel was even aware of Petitioner's entitlement to a Turner inquiry. Counsel, armed with only two years of legal experience, had never before been assigned to a capital case and testified that he had no reason for failing to request the Turner inquiry even though he was concerned about racial bias.

If, as the record suggests, counsel was unaware of the Turner right, his failure to make a Turner inquiry could not have been a matter of trial strategy. Therefore, Petitioner was denied his right to question prospective jurors on the subject of racial bias, and counsel's failure to make a Turner inquiry without tactical reason given the "tough circumstances" that confronted him fell below minimum professional standards under the Strickland test. See Strickland, 466 U.S. at 688-94.

I am further troubled by the panel's suggestion that Petitioner must establish actual prejudice. "Turner explicitly rejected the dissent's suggestion that the death sentence should stand because no actual jury prejudice was evident from the record." Rose v. Clark, 478 U.S. 570, 587 n.2 (1986) (Stevens, J. concurring). Here, as in Turner, the likelihood that the jury was biased constitutes sufficient harm to the Petitioner. Accordingly, I would grant the petition for rehearing en banc in order to clarify Turner in the context of an ineffective of assistance of counsel claim.