In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3138

HENRY GRIFFIN,

*Petitioner-Appellant*,

*v.*

GUY PIERCE,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 5024—**James B. Zagel**, *Judge.*

ARGUED MAY 27, 2010—DECIDED SEPTEMBER 22, 2010

Before BAUER, WOOD, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Henry Griffin was convicted by a jury of murder, solicitation to commit murder, and conspiracy to commit murder. A judge sentenced him to death. Griffin filed two post-conviction petitions in Illinois state courts, to no avail. He then filed a petition for writ of habeas corpus in the district court, claiming that the State knowingly used perjured testimony and that his sentencing counsel was ineffective. The district

court denied his petition but granted a certificate of appealability on these two claims. Griffin appealed, and we grant the petition on the *Strickland* claim only.

## I. Background

### A. Underlying Criminal Case

The recitation of the facts pertaining to Griffin's underlying conviction is taken from the Illinois Supreme Court's opinion in *People v. Griffin*, 592 N.E.2d 930, 931-32 (Ill. 1992) (*Griffin I*), *cert. denied*, 507 U.S. 924 (1993):

On June 21, 1984, the body of Carl Gibson was found near the 73rd Street exit ramp off of the Chicago Skyway. He had been shot four times at close range several hours earlier.

At the time, the Chicago Police Department and the State's Attorney's Office of Cook County were involved in an investigation of a major drug operation located on Chicago's south side that targeted Charles Ashley, a drug dealer whose activities yielded an estimated $3 million annually. Gibson was employed in Ashley's drug operation.

Darryl Moore, who was also employed by Ashley's drug operation, was arrested in late July 1984 on drug and unlawful use of weapons charges. While in jail, Moore contacted Detective Michael Pochordo who was with the Violent Crimes Division of the Chicago Police Department. Moore claimed to have information about the Gibson murder. Pochordo set up a meeting with Moore

and representatives of the State's Attorney's Office. At a meeting on August 7, 1984, Moore advised members of the State's Attorney's Office that Griffin was involved in the Gibson murder. So the State's Attorney's Office requested permission for a consensual overhear device for use in Moore's contact with Griffin. The Circuit Court of Cook County approved an application for the overhear device, and on August 9, 1984, a tape-recording device was assembled at the State's Attorney's Office and used to record a telephone conversation between Moore and Griffin. Moore recognized Griffin's voice because he had known him through their "enforcer" work and had spoken to him at least 100 times. During this taped conversation, Griffin implicated himself in the Gibson murder.

Griffin was arrested and taken into custody. James Allen was also arrested in connection with the murder, and the two were placed in separate interview rooms. Assistant State's Attorney Neil Cohen was introduced to Griffin and read him his *Miranda* warnings. Griffin asked whether Cohen had talked to Allen and, upon hearing that Allen had given a statement, Griffin waived his *Miranda* rights and confessed to his participation in Gibson's murder. Griffin's confession revealed the following facts: Ashley approached Griffin and asked him if he would kill Gibson for $2,500. Ashley wanted Gibson eliminated because he suspected that Gibson was secretly passing information to police. The offer was made and accepted in the presence of Allen. Griffin and Allen went to Moore's apartment to obtain a gun. Moore was one of Ashley's "enforcers" and he and Griffin had

worked together in the past. Moore gave Griffin a .38-caliber revolver, and Griffin and Allen left the apartment and took Griffin's family members home. Allen waited in the car while Griffin entered the home. Then Griffin returned to the car accompanied by Gibson. Allen drove, Gibson sat in the passenger seat, and Griffin sat in the back seat. Allen drove onto the Chicago Skyway at 89th Street, proceeding southbound. When he reached a toll plaza, he turned around and proceeded northbound. While driving northbound on the Skyway, Griffin shot Gibson four times in the back of the head with a .38-caliber revolver. Allen then exited the Skyway at 73rd Street and stopped the car on the exit ramp. Griffin pulled Gibson's body out of the car. The next day Griffin gave the murder weapon to Ashley. Griffin and Allen disposed of the rental car used in the murder. Ashley paid Griffin in cash and cocaine.

Griffin was indicted along with codefendants Ashley and Allen for conspiracy to commit murder, solicitation to commit murder, and murder. Prior to trial, the court found Griffin fit to stand trial and denied his motion to suppress evidence seized pursuant to a search warrant. In June 1985, all three defendants were tried simultaneously—Griffin and Allen by separate juries, and Ashley by Judge Earl Strayhorn. The prosecution's chief evidence against Griffin consisted of the taped telephone conversation between Griffin and Moore; an unsigned, court-reported statement of Griffin; Assistant State's Attorney Cohen's testimony about his conversations with Griffin; and Moore's testimony.

## B. Additional Facts

The prosecutor offered into evidence the tape recording of the August 9, 1984, telephone conversation between Moore and Griffin. Griffin objected to the tape's admission. Though he now argues that the tape is largely unintelligible, he did not object on that ground when opposing the tape's admission. Indeed, the Illinois Supreme Court found that at the time of admission, Griffin did not object on audibility grounds, *Griffin I*, 592 N.E.2d at 934, and our own review of the trial transcript confirms the correctness of that finding. And the trial court, having heard the transcription of the tape-recorded conversation, apparently found the tape sufficiently intelligible and admitted it. The tape recording of Griffin and Moore's telephone conversation was played for the jury.

Griffin's unsigned statement, taken in the police interview room on August 9, 1984, in the presence of Assistant State's Attorney Cohen and Detective Pochordo and reported by a court reporter, Joseph A. Szybist, was read to the jury. The court reporter testified that the statement was an accurate transcription of the conversation between Cohen and Griffin. According to that statement: Griffin said that on June 20, 1984, Chuck Ashley asked him to kill one of his workers, Gibson, for $2,500. Ashley told Griffin that he wanted Gibson killed because Gibson was a snitch. Griffin accepted the offer, which was made and accepted in the presence of Allen a/k/a "Head." Griffin and Allen went to the apartment of Moore (a/k/a Kareem) to get a revolver. Griffin asked Moore for a gun, but didn't tell him what it was for. Moore gave Griffin a loaded .38 special

revolver. Griffin and Allen took Griffin's family home and Griffin returned to the car with Gibson. Griffin and Gibson got into the rental car that Allen was driving. Gibson was in the front passenger seat, and Griffin got in the back seat. They drove to the Skyway, turned around, and then Griffin killed Gibson with the gun, shooting him four times in the back of the head. They got off the Skyway at the 73rd exit ramp and Griffin pulled the body out. Griffin gave the gun he had used to Ashley and the rental car was dumped. Ashley paid Griffin $1,500 in cash and $1,000 worth of cocaine. Earlier that day (August 9, 1984) Griffin received a phone call from Kareem (Moore) and talked about the contract on Gibson.

At trial Assistant State's Attorney Cohen testified about the recorded telephone conversation between Griffin and Moore; Cohen had listened to the conversation as it took place. Cohen stated that throughout the recorded conversation, the person talking with Moore responded to the name "Grif." Cohen also testified that the person who spoke to Moore had a "low, gruff voice" and that it was the voice he heard speaking at the end of the tape when the police entered and arrested Griffin. Raymond Stockholm, the supervising investigator with the State's Attorney's Office, corroborated Cohen's testimony that Moore addressed the person to whom he spoke as "Grif"—and "several times" at that. Cohen testified that when he spoke to Griffin on the day of his arrest, he recognized Griffin's voice as the same voice he had heard during the recorded conversation with Moore. According to Cohen, Griffin acknowledged

that he discussed the Gibson killing with Moore on the phone earlier that day.

Cohen further testified regarding Griffin's oral and written statements. Cohen stated that on the day of Griffin's arrest, he had a conversation with Griffin regarding Griffin's participation in the Gibson murder. Cohen first advised Griffin of his *Miranda* rights and then asked if he would like to talk. Griffin asked Cohen if he had been talking to "Head" (Allen), and Cohen answered that they had been talking about the Gibson murder. Griffin agreed to talk. Griffin told Cohen that he had killed Gibson. More specifically, Cohen testified that Griffin advised him of a June 20, 1984 conversation with Chuck Ashley in which Ashley asked him to kill two people, including Gibson, in exchange for $2,500, and Griffin agreed to do it. According to Cohen, Griffin told him that Allen was present at the time. Cohen stated that Griffin said he and Allen met with Moore; Allen and Griffin picked up some people and then dropped them off at an apartment. Allen waited in the car while Griffin got out. Griffin returned with Gibson who got in the front seat and Griffin got into the back. Cohen testified that Griffin told him that Allen drove onto the Skyway, first going southbound, then northbound, and between the toll plaza and the 73rd Street exit ramp, Griffin shot Gibson four times in the back of the head. Griffin stated that they dropped the body on the 73rd Street exit ramp. According to Cohen's testimony, Griffin said he killed Gibson because Ashley paid him to do it, giving him $1,500 in cash and $1,000 worth of cocaine. Following their conversation, Cohen asked Griffin if he

would be willing to give a written court-reported state-ment. Griffin agreed to do so. Cohen said that after he read the statement to Griffin, he asked Griffin to sign it. But Griffin asked to speak to an attorney and did not sign the statement.

At trial Moore testified that both he and Griffin worked for Ashley: Griffin in "enforcing"—meaning beating and killing people for money—and Moore in drug selling, enforcing, and doing contract work. Moore acknowl-edged that he had been a contract killer since 1980 and had been convicted of rape and two robberies. Moore stated that he had known Griffin for "quite a while" and had been doing work with him for "a few weeks." Moore said that in June 1984, Ashley told Moore he wanted him to kill Gibson who ran the day-to-day operations of Ashley's drug operation. Moore testified that Ashley offered him some money to kill Gibson; Moore tried to get Ashley to pay him more but without success, so Moore suggested that Griffin might be interested in the contract on Gibson. According to Moore, on June 20, 1984, Griffin came to his house and told him he had a contract for Gibson from Ashley and asked Moore to go in on it with him. Moore declined. Moore testified that the next day, June 21, Griffin and Allen came over to his house and Griffin told Moore that he had a contract out from Ashley and it was easy; Griffin described how he tricked Gibson out of the house and shot him while Allen was driving on the Skyway.

Moore also testified about his tape-recorded telephone conversation with Griffin on August 9, 1984 from the

State's Attorney's Office.[1] Moore stated that he called the person to whom he spoke "Grif" and that person never said "I'm not Grif." Moore testified that during that conversation, the other person told Moore about how he and Allen had killed Gibson, the car and gun they had used, and Ashley's contract on Gibson.

Moore acknowledged that in exchange for his testimony at trial, the State's Attorney's Office agreed to dismiss a pending gun case and drug case, allow him to plead guilty to a sentence of time served, reduce an armed robbery charge to robbery, place him in the witness protection program, and relocate him after he testified at trial. On cross-examination, Moore initially denied that he had received any money since August 1, 1984 until the time of his testimony in connection with the case or his participation in it. But when pressed about whether he had received money from the State's Attorney's Office, Moore admitted that he had received money for "the relocation thing" from "Mr. Wadas" (an Assistant State's Attorney). Subsequently, Moore back-pedaled and offered that he hadn't received any money; he said that checks were made out to "various locations." Several times Moore denied receiving any money, including from police officers.

---

[1] In his brief, Griffin says that Moore testified about "the largely unintelligible taped telephone conversation." Moore testified about this conversation but never described the tape as unintelligible. Nor did anyone else at trial, not even the trial judge who listened to the tape recording before ruling on its admissibility, describe it as unintelligible.

The jury found Griffin guilty on all counts. Griffin waived his right to a sentencing jury for both the eligibility and sentencing stages. Judge Strayhorn found Griffin death eligible. The court asked the attorneys if they were ready to proceed with the aggravation/mitigation phase of sentencing. Defense counsel responded, "Not really" and sought a continuance for filing post-trial motions. The motion for continuance was denied, and the State offered its case in aggravation: "all of the evidence that the Court heard during the trial of this case" and certified copies of Griffin's seven prior convictions.

Griffin called two witnesses in mitigation: Griffin and Ida Powe—a witness with whom Griffin's counsel had never spoken "until just a few minutes" before she testified. Griffin testified about his drug addictions and prior convictions and denied killing anyone. He also stated that when he was a teenager he had been placed in a mental institution for attempted suicide and depression and had escaped on two occasions. Powe testified that she had known Griffin since 1974 and had never known him to commit any type of violence against another person. She did not think he was capable of murder.

In closing argument, Griffin's counsel emphasized that there was no eyewitness to the Gibson murder and no physical evidence. Counsel argued that the only evidence was the testimony "of a contract killer who was thoroughly impeached"; "a tape recording"—on which Powe did not recognize Griffin's voice; and Griffin's unsigned statement, which in counsel's opinion "was really questionable."

Griffin's counsel later stated (in an affidavit submitted with Griffin's post-conviction petition) that he had never interviewed Powe and had not known of her existence until the sentencing hearing. Powe's affidavit indicated that during the sentencing proceedings, Griffin's counsel approached the gallery seeking persons to testify on Griffin's behalf, and she essentially volunteered to do so.

Judge Strayhorn sentenced Griffin to death. Thereafter, Griffin's sentence was commuted to life imprisonment. This did not moot the habeas petition; Griffin may seek a lower sentence. *See Simpson v. Battaglia*, 458 F.3d 585, 595 (7th Cir. 2006).

### C. Post-Conviction Proceedings

Griffin filed two post-conviction petitions. In the first, which was filed while his direct appeal was pending, Griffin claimed that the State knowingly suborned perjury from key prosecution witness Moore. On August 19, 1986, Sam Adam, counsel for Griffin on direct appeal (Adam had represented Ashley at trial), videotaped Moore recanting his trial testimony and admitting that he committed perjury at Griffin's trial. The statement indicated that Moore agreed with Detective Pochordo to lie at Griffin's trial in exchange for money. Moore claimed that Pochordo and members of the State's Attorney's Office told him what to say. Moore stated that he was given large cash payments to live a lavish lifestyle and that he was given money to buy the catering truck he wanted in exchange for his testimony. Adam also obtained a transcript of Moore's testimony given August 20, 1987, in the Circuit Court of

Cook County in *Illinois v. Freeman* in which Moore testified that he had lied in the Gibson trial and that he had been paid to testify as a State witness. Griffin requested an evidentiary hearing. Judge Strayhorn found "no constitutional imperfections" in the case and denied his petition without a hearing. On appeal, Griffin argued this was error. The Illinois Supreme Court affirmed Griffin's conviction, sentence, and the denial of his post-conviction petition. *Griffin I*, 592 N.E.2d 930. The state supreme court found that the trial court did not abuse its discretion in ruling on the habeas petition without holding an evidentiary hearing. *Id.* at 933.

   In his second post-conviction petition, Griffin brought, among others, a claim under *Strickland v. Washington*, 466 U.S. 668 (1984). Griffin argued that his counsel was ineffective for failing to investigate and present at sentencing the following mitigation evidence: (1) his school, mental health, and prison records; (2) a psychological evaluation; and (3) testimony from several relatives. (The original petition included affidavits from five relatives; Griffin apparently supplemented his petition with the addition of six more affidavits from relatives and friends. This included an affidavit from Powe that gave greater insight into Griffin's personal life than her sentencing testimony had.) This second petition was supported by the affidavit of George Howard, Griffin's counsel at both trial and sentencing. Howard's affidavit stated that prior to the capital sentencing hearing, he "made no attempt to investigate for mitigating evidence," "the only defense against the death penalty [he] considered and presented was residual doubt of guilt," and "there was no strategic

reason" for his failure to investigate for mitigating evidence. Judge Strayhorn dismissed the petition without a hearing.

The Illinois Supreme Court affirmed. *People v. Griffin*, 687 N.E.2d 820 (Ill. 1997) (*Griffin II*), *cert. denied*, 524 U.S. 956 (1998). The court recognized that "counsel has a duty to investigate potential sources of mitigation evidence, or to have a reason not to make such an investigation" and stated that the "decision whether to present a particular witness is generally a strategic choice which cannot support a claim of ineffective assistance of counsel." *Id.* at 833 (citations omitted). Then, relying on the special concurrence in Griffin's prior appeal, the state supreme court found that "counsel's performance was clearly a strategic decision." *Id.* (The special concurrence said that "[a]pparently believing that the defendant's personal history provided little, if any, mitigation, counsel chose to argue to the sentencing judge that the evidence of the defendant's guilty . . . should not form the basis for a death sentence." *Griffin I*, 592 N.E.2d at 938 (Miller, C.J., specially concurring).) The Illinois Supreme Court added that "information on defendant's personal history was included in the presentence investigation report. Defense counsel cannot be faulted for failing to introduce mitigation evidence that was already contained in the report." *Griffin II*, 687 N.E.2d at 834. The Illinois Supreme Court's decision does not explicitly mention Howard's affidavit. (Respondent does not dispute Griffin's assertion that his second post-conviction petition was in fact supported by Howard's affidavit.)

The Illinois Supreme Court determined that Griffin had not shown prejudice, finding "no reasonable probability that, absent trial counsel's alleged deficiencies, the sentencer would have found that the mitigating circumstances preclude the imposition of the death penalty." *Id.* The court cited Griffin's confession to having executed Gibson for money and narcotics, which was corroborated by other trial evidence, and Griffin's lengthy criminal history. According to the court, the proffered mitigation evidence was either "cumulative to evidence already introduced at trial" or "not inherently mitigating." *Id.* The Illinois Supreme Court said that information about Griffin's school, mental health, and prison records was contained in the presentence investigation report and Griffin's mitigation testimony, that the sentencing court was aware of Griffin's mental condition through testimony at the fitness hearing, and that the testimony from Griffin's family members would have gone to his troubled, disadvantaged childhood, which was presented in the presentence report. *Id.* Thus, the state supreme court concluded that the proffered testimony "would have been cumulative and . . . not inherently mitigating." *Id.* Finally, the Illinois Supreme Court relied on the fact that the post-conviction court, which had been the sentencing court, stated that the "proffered evidence would not have changed defendant's sentence." *Id.* The United States Supreme Court denied certiorari. *Griffin v. Illinois*, 524 U.S. 956 (1998).

In August 1998, Griffin filed a petition for writ of habeas corpus in the district court, claiming that the State knowingly used the perjured testimony of a key

witness and that his sentencing counsel was ineffective in failing to conduct an investigation into and present any mitigation evidence. The district court held a hearing on both claims on several days from 2002 to 2004 at which Moore testified that he lied at Griffin's trial when he said that Griffin was responsible for Gibson's murder. According to Moore, Detective Pochordo fed him all the information about the Gibson murder. Moore denied that Griffin was the person to whom he was speaking during the tape-recorded conversation played at Griffin's trial; Moore also denied that the conversation was about the Gibson murder. Moore testified that he had received thousands of dollars from the Illinois State's Attorney's Office and that he had lied to Griffin's jury about how much he had received or was to receive as well as the purpose of the money. Moore said that after Griffin's conviction, he and his girlfriend received several thousand dollars each, which was confirmed by the State's Attorney's Office's records. Moore claimed that the prosecutors gave him money after he testified "for lying."

Financial records from the State's Attorney's Office showed that Moore received cash and benefits totaling in excess of $66,000. There was evidence that the money was spent on luxury hotel rooms, apartment, car rentals, and payment of dental expenses for Moore's girlfriend. Moore claimed that the State paid rent for apartments that were narcotics houses. He testified that he was never part of the witness protection program, that he didn't need protection, and that the State's Attorney's Office called the benefits "witness protection" to justify giving

him the money. At the time of the evidentiary hearing, Moore was serving a sixty-year sentence for aggravated criminal assault along with shorter concurrent sentences for aggravated kidnapping and robbery. He admitted that he picks and chooses when to tell the truth and said that he "despised" the State's Attorney's Office.

The district court heard testimony or received stipulations from Franklin Freeman; Detective Pochordo; the Assistant State's Attorneys who prosecuted Griffin's criminal case; their supervisors; George Howard; and others. Freeman testified that Moore told Freeman he was working for Pochordo and that Pochordo would believe everything they told him. Pochordo confirmed that following the Gibson trial, Moore was neither particularly concerned about his safety nor particularly interested in the witness relocation program. Pochordo admitted that Moore asked him for $200 once, and Pochordo gave it to him. But Pochordo denied knowledge that Moore received any money from the State's Attorney's Office.

The district court also heard testimony about the procedures for disbursing money from the State's Attorney's Office's relocation unit. The State's witnesses testified that it would be unusual to provide large cash payments such as $2000 to relocation witnesses. The witnesses testified that the relocation program paid for housing and preferred to use apartments, but would use hotels if necessary. The evidence was that the relocation program did not typically include medical expenses for witnesses or assistance to purchase or rent a car. The parties stipulated that former

Cook County prosecutor William Hibbler (now a district judge in the Northern District of Illinois) would testify that in the mid-1980s there were no guidelines as to how the relocation program was to be administered, benefits were decided on a case-by-case basis, and it was "very possible" that no one person kept track of the expenditures on Moore. Each state prosecutor involved in Griffin's criminal trial testified that he did not promise Moore money in exchange for his testimony; each prosecutor expressed a belief that Moore was in danger and that the money spent on Moore's behalf was intended to relocate him in order to protect him; and each testified that he believed Moore's trial testimony was true.

The district court denied Griffin's habeas petition. The court found that from August 1984 to June 1986, the State's Attorney's Office spent over $66,000 in relocation expenses for Moore and his dependents, the majority of which was paid after Moore testified. Although the court found that one could infer that "the way the money was spent on Moore was inconsistent with witness protection," the court credited the prosecutors' testimony that "the money was paid to relocate and to protect Moore from potential threats"—they were not paying Moore for his testimony. The court relied on evidence that when the payments were made, the State's Attorney's Office had no guidelines. The court also credited the prosecutors' and Detective Pochordo's testimony that they believed Moore's trial testimony was true. And the court found that Griffin failed to prove that Moore perjured himself or that Pochordo or the prosecutors knew it. The district court therefore concluded that

Griffin had not carried his burden of proving a depriva-
tion of due process.

With respect to the *Strickland* claim, the district court
found, based on Howard's affidavit and testimony at
the hearing, that he "made no investigation for mitigating
evidence," he "had no good reason" not to conduct such
an investigation, and his failure to do so did not meet
the objective standards of reasonableness. However,
deferring to the "state court finding of fact" that Griffin's
sentence would not have been different had the mitiga-
tion evidence been presented, the district court concluded
that Griffin suffered no prejudice. This "finding of fact"
was based on the sentencing judge's statement that the
proffered mitigation evidence would not have changed
Griffin's sentence. In a footnote, the district court added
that it would reach the same conclusion absent deference
to the state court finding, but the court did not expand on
this conclusion. The district court entered judgment,
denying Griffin's habeas petition, and Griffin appealed.

Griffin sought a certificate of appealability as to two
claims: (1) that he was denied due process of law when
the State knowingly presented and failed to correct false
testimony of key witness Moore, and (2) that he
was denied effective assistance of counsel at his capital
sentencing hearing when his attorney, who conducted
virtually no investigation, failed to present substantial,
available mitigating evidence. The district court issued
a certificate of appealability as to these two claims.

## II. Analysis

Griffin raises the two certified claims on appeal.

### A. Standard of Review

We review the district court's decision to deny Griffin's habeas petition de novo and we review its factual findings for clear error. *Ebert v. Gaetz*, 610 F.3d 404, 411 (7th Cir. 2010). Our review is constrained by the Antiterrorism and Effective Death Penalty Act of 1996, specifically 28 U.S.C. § 2254(d). A federal court may grant habeas relief only if the state courts' adjudication of Griffin's claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d). Though Griffin mentions the "contrary to" clause of § 2254(d), his claims are limited to the "unreasonable application" of federal law and the "unreasonable determination of the facts."

"A state court unreasonably applies federal law if it identifies the correct legal principle but unreasonably applies it to the facts of the case, or if it unreasonably refuses to extend a principle to a context in which it should apply." *Goudy v. Basinger*, 604 F.3d 394, 399 (7th Cir. 2010) (citing *Williams v. Taylor*, 529 U.S. 362, 407 (2000)). The state court's application of federal law must have been both incorrect and unreasonable, "that is, lying well outside the boundaries of permissible differences of

opinion." *Id.* (quoting *Tolliver v. McCaughtry*, 539 F.3d 766, 774 (7th Cir. 2008)). And a "decision involves an unreasonable determination of the facts if it rests upon fact-finding that ignores the clear and convincing weight of the evidence." *Id.* We deferentially review the decision of the last state court to address Griffin's petition on the merits. *Ebert*, 610 F.3d at 411. The state court's factual findings are presumed correct unless Griffin rebuts that presumption with clear and convincing evidence. *Id.; see also* 28 U.S.C. § 2254(e)(1). We review the post-conviction court's decision with respect to the *Napue* claim and the Illinois Supreme Court's decision in *Griffin II* with respect to the *Strickland* claim.

## B. *Napue* **Claim**

The Supreme Court has held that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *see also United States v. Agurs*, 427 U.S. 97, 103 (1976) (holding prosecutor has an obligation to provide defense with exculpatory information even when no request has been made); *Giglio v. United States*, 405 U.S. 150, 154-55 (1972) (new trial required where government failed to correct false testimony by key witness about a benefit he received for testifying and the prosecutor should have been aware of the falsehood). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue*, 360 U.S. at 269. The constitutional

violation is not cured by "the fact that the jury was apprised of other grounds for believing that the witness . . . may have had an interest in testifying against petitioner." *Id.* at 270. When a conviction is obtained through the knowing use of false testimony, it must be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103; *see also Giglio*, 405 U.S. at 154; *Napue*, 360 U.S. at 271. Thus, a new trial is required if a petitioner establishes that (1) the prosecution presented false testimony or failed to disclose that false testimony was used to convict, (2) the prosecution knew or should have known that the testimony was false, and (3) there is a reasonable likelihood that the testimony could have affected the jury's judgment. *Agurs*, 427 U.S. at 103. Even if we assume that Griffin could establish the first two prongs of this standard, he cannot show a reasonable likelihood that Moore's false testimony could have affected the judgment of the jury.

Griffin submits that he was prejudiced by Moore's testimony because there was no physical evidence or eyewitness testimony linking Griffin to Gibson's murder and Moore was the key prosecution witness upon which his conviction largely depended. According to Griffin, take away Moore's testimony and the State is merely left with Griffin's unsigned statement and the recording of his consensual overhear with Moore, which was unintelligible and "translated" by Moore.

Griffin criticizes his written statement because it was unsigned. But the absence of his signature does not

render his written statement useless evidence. Griffin cannot refute that in his written statement he admitted to having killed Gibson—shooting him four times in the back of the head—because Ashley put a contract on Gibson and Griffin accepted it. Griffin also errs in claiming that his unsigned statement was the sole piece of other evidence against him. The court reporter who took Griffin's written statement testified at trial that the statement was an accurate transcription of the conversation between Cohen and Griffin. And Assistant State's Attorney Cohen testified extensively about Griffin's oral and written statements in which he confessed to killing Gibson for Ashley. According to Cohen, after being advised of his *Miranda* rights, Griffin agreed to talk to Cohen about the Gibson murder and admitted that he had killed Gibson. We should add that Cohen's testimony establishes that Griffin's written statement and oral statement were consistent on the facts.

And there's more. Cohen also testified about the telephone conversation between Griffin and Moore—Cohen was listening in on the entire conversation. Both Cohen and investigator Stockholm, who conducted the overhear, testified that the person talking with Moore responded to the name "Grif." Cohen stated that when speaking with Griffin after his arrest, Cohen recognized Griffin's voice as the one he heard during the recorded conversation with Moore. And Cohen testified that during his conversation with Griffin after his arrest, Griffin acknowledged having discussed the Gibson killing with Moore on the phone earlier that day. Neither

Cohen, Szybist, nor Stockholm were seeking any benefits from the State in testifying against Griffin. *See United States v. Williams*, 81 F.3d 1434, 1439-40 (7th Cir. 1996) (holding no abuse of discretion to deny defendants' request for new trial based on government's knowing use of perjured testimony and concealment of evidence favorable to the defense where tainted testimony was corroborated by law enforcement).

Griffin relies on *United States v. Boyd*, 55 F.3d 239 (7th Cir. 1995), in which we held that the district court did not abuse its discretion by granting new trials where the government had knowingly used perjured testimony and failed to disclose exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The government's case in *Boyd* "depended heavily on" the testimony of the witnesses whose testimony the defendant alleged was perjured. And the district judge found that the prosecutors' misconduct was "far more serious than" the typical case in which a prosecutor is accused of knowingly using false testimony or failing to disclose exculpatory material. *Id.* at 241. We did not dispute that assessment. *Boyd* is an extreme example of gross prosecutorial misconduct; Griffin's is nothing like it. Even if we assume that Moore was lying under oath at Griffin's trial, *Boyd* does not require a new trial in this case.

As we observed in *Boyd*, "[t]he knowing use of perjured testimony is not an automatic ground for a new trial." *Id.* at 243. Although Moore's testimony was important, it was not essential to the State's case given all the other weighty evidence against Griffin. As for the taped tele-

phone conversation between Moore and Griffin, the record does not bear out Griffin's suggestion that Moore had to translate the recording. Sure, Moore testified about what he and Griffin said during their telephone conversation, but he did not interpret the words or sounds on the tape as it was played for the jury. Though the district court characterized the tape as unintelligible, there is no hint in the trial record that the tape was unintelligible, not even in part, approximately twenty years before when it was played at trial. Griffin objected to the tape's admission, but unintelligibility was not one of the grounds he raised. And we know from the record that Judge Strayhorn listened to the tape before admitting it and explained the legal standards that govern the admissibility of voice identification and sound recordings—his oral ruling on the tape's admissibility spans several pages of transcript and references several state court decisions—which suggest that the tape was sufficiently intelligible. *Cf. People v. Rogers*, 543 N.E.2d 300, 303 (Ill. App. Ct. 1989) (stating that "a partially inaudible tape recording is admissible unless the inaudible portions are so substantial as to render the recording untrustworthy as a whole").

The fact that the State lavished Moore with benefits prior to and after his testimony suggests that Moore's testimony was valuable to the State in its case against Griffin (as well as other cases). But Moore's testimony was in no way the only or even strongest piece of evidence against Griffin. The remaining evidence establishes that Griffin's conviction was secure even if the

jury completely discredited Moore's testimony. The district court correctly denied habeas relief on the *Napue*-false testimony claim.

## C. *Strickland* Claim

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set forth the legal principles governing ineffective assistance of counsel claims. Under *Strickland*, a petitioner must show both that his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and that the deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 688-93; *Ebert*, 610 F.3d at 411. A state court's conclusion whether counsel's assistance was effective and whether counsel's performance prejudiced the defendant are mixed questions of law and fact which we review de novo. *Strickland*, 466 U.S. at 698; *Allen v. Chandler*, 555 F.3d 596, 600 (7th Cir. 2009). Respondent concedes that Howard's failure to conduct any investigation into mitigation evidence was unreasonable—and it was—so we focus our attention on whether Griffin has shown prejudice.

With respect to *Strickland*'s prejudice component, a petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Allen*, 555 F.3d at 600. When chal-

lenging his sentence, a petitioner must show that but for counsel's errors, there is a reasonable probability that he would have received a different sentence. *Strickland*, 466 U.S. at 695; *see also Porter v. McCollum*, 130 S. Ct. 447, 453 (2009). Courts assess that probability by evaluating "'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and reweigh[ing] it against the evidence in aggravation.'" *Porter*, 130 S. Ct. at 453-54 (quoting *Williams*, 529 U.S. at 397-98). We review for reasonableness the state court's determination that such a probability does not exist. *Ellison v. Acevedo*, 593 F.3d 625, 633 (7th Cir. 2010). The petitioner's bar is set high, and "'only a clear error in applying *Strickland* will support a writ of habeas corpus.'" *Byers v. Basinger*, 610 F.3d 980, 988 (7th Cir. 2010) (quoting *Allen*, 555 F.3d at 600).

Griffin has cleared the bar. Had Griffin's counsel conducted an investigation into mitigation and presented the proffered mitigation evidence, the sentencing court "would have learned of the 'kind of troubled history [the Supreme Court has] declared relevant in assessing a defendant's moral culpability.'" *Porter*, 130 S. Ct. at 454 (quoting *Wiggins v. Smith*, 539 U.S. 510, 535 (2003)). This case falls in line with those cases in which the Supreme Court has concluded that counsel's failure to investigate and present proffered mitigation evidence prejudiced the petitioner. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 390-93 (2005) (mitigation case built on evidence that petitioner was raised in a "slum environment," quit school at 16, and had a serious drinking problem; test results pointed to schizophrenia and other disorders; test scores showed

third-grade level of cognition despite nine years of school; his parents were severe alcoholics who drank constantly; there was no expression of parental love, affection or approval, only yelling and verbal and physical abuse; petitioner lived in a house with no plumbing, slept in an attic with no heat; his mother went missing frequently for several weeks at a time; and he suffered from fetal alcohol syndrome); *Wiggins*, 539 U.S. at 535 (petitioner suffered "severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother," physical torment, sexual molestation, rape in foster care, homelessness, and diminished mental capacities which created a reasonable probability the jury would have reached a different sentence); *Williams*, 529 U.S. at 395-96 (mitigation evidence included records of "nightmarish childhood," involving severe and repeated beatings by petitioner's father and criminal neglect by both parents, placement in an abusive foster home during parents' incarceration, and petitioner was "borderline mentally retarded" and did not go beyond sixth grade). Had Griffin's counsel investigated and presented the proffered evidence, Judge Strayhorn would have learned of Griffin's father's alcoholism and abusiveness, Griffin's mother's absences from the home, and the circumstances of his mother's death and how it affected him, including the increasing mental abuse from his father. The judge would have heard about Griffin's diagnosis of "schizophrenic reaction, chronic undifferentiated type—with suicidal tendencies" and other details of his mental health and drug addictions, his two attempts at suicide, and his attempts

at self-mutilation. The judge also would have heard about Griffin's good acts, including caring for sick and dying family members—even for his father.

The Illinois Supreme Court concluded that there was no reasonable probability that absent counsel's alleged errors, the sentencing court would have found that the mitigating evidence precluded the death penalty. The first problem with that assessment is that it is unclear to us how much weight the state supreme court gave to Judge Strayhorn's statement that the introduction of the proffered evidence would not have changed Griffin's sentence. Though we, and the Illinois Supreme Court, may give weight to such a statement, it is not conclusive. *Raygoza v. Hulick*, 474 F.3d 958, 964 (7th Cir. 2007) (stating that where the same judge presides over both the post-conviction proceeding and trial, "we cannot accept as conclusive the judge's statement that the new evidence would not have made any difference"). The question is not whether a particular judge would have imposed a different sentence, but rather whether there was a "reasonable probability" that the sentence would have been different. In assessing that probability we conduct an objective evaluation of the evidence. *Id.* at 964-65.

Another problem: the Illinois Supreme Court gave consideration to the seriousness of Griffin's offense, the corroboration of Griffin's confession by other evidence, and his lengthy criminal history, but it did not properly evaluate the totality of the mitigation evidence and reweigh it against the aggravation evidence as it must. *See, e.g., Porter*, 130 S. Ct. at 453-54. After all, the state

supreme court thought the proffered mitigation evidence was merely cumulative and not inherently mitigating. But most of the proffered evidence was neither. And the court's determination to the contrary was unreasonable. *See Hall v. Washington*, 106 F.3d 742, 752 (7th Cir. 1997) (Illinois Supreme Court's view that proffered mitigation evidence was mere character evidence and cumulative was unreasonable finding). The state supreme court thought that the information about Griffin's personal history was included in the presentence report. *See Griffin II*, 687 N.E.2d at 834 ("We add that information on defendant's personal history was included in the presentence investigation report."). *Some* information about Griffin's personal history was in the report, but the report was an incomplete and at times inaccurate reflection of Griffin's tragic personal history. The presentence report referenced Griffin's representation of a "normal childhood and good relationships with his parents . . . . " His childhood was anything but normal.

Respondent relies on *Lear v. Cowan*, 220 F.3d 825 (7th Cir. 2000), in arguing that there is no reasonable probability that the omitted evidence would have changed Griffin's sentence. Like Griffin, Lear was sentenced to death and argued ineffective assistance of counsel at sentencing. Lear specifically argued that he was entitled to the assistance of a "mitigation specialist" who would conduct a thorough investigation into his past to find mitigation evidence. *Id.* at 829. We determined that the denial was harmless because the evidence in aggravation was "compelling": Lear had committed two prior murders, and the murder for which he was sen-

tenced was "entirely gratuitous [in] character." *Id.* The only additional mitigation evidence uncovered was that Lear was a good student, had a somewhat below-average I.Q., used cocaine, and had a mental disorder. *Id.* The mitigation evidence that Griffin offers is markedly different—nothing hints that Lear had as horrendous a childhood as Griffin— and there is a reasonable probability that it would have made a difference in Griffin's sentence.

The Illinois Supreme Court's determination that Griffin was not prejudiced by his counsel's deficient performance at sentencing was an unreasonable application of *Strickland*.

### III. Conclusion

We REVERSE the district court's judgment in part and remand with instructions to grant Griffin's habeas petition on the *Strickland* claim only and allow the State 120 days within which to resentence Griffin.