In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-3268

ANTHONY MERTZ,

*Petitioner-Appellant,*

*v.*

TARRY WILLIAMS, Warden,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 4174 — **Matthew F. Kennelly**, *Judge.*

ARGUED SEPTEMBER 17, 2014 — DECIDED NOVEMBER 18, 2014

Before FLAUM, KANNE, and ROVNER, *Circuit Judges.*

FLAUM, *Circuit Judge.* Anthony Mertz was sentenced to death in 2003 for the murder of Shannon McNamara. In 2011, Illinois Governor Pat Quinn commuted his sentence to life imprisonment without the possibility of parole. Mertz now brings this appeal of the district court's denial of his habeas petition alleging ineffective assistance of his sentencing counsel for failing to rebut evidence that Mertz committed an uncharged murder, as well as an uncharged arson. With-

out addressing whether Mertz's counsel's performance was deficient, the district court held that Mertz could not show the necessary prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984), to succeed on his claim for relief. We affirm.

## I. Background

### A. Factual Background

On June 12, 2001, Shannon McNamara's roommate found her dead in their college apartment. McNamara was naked from the waist down, and her shirt and bra were pulled up over her face. A washcloth was stuffed inside of her mouth, and a piece of a latex glove was discovered near her head. McNamara had a large cut down the center of her abdomen, bruises to her face, and a fractured neck. The right lobe of her liver was lacerated as a result of blunt force trauma. McNamara's body also bore knife wounds to her throat, genitals, and back. McNamara's bedroom window screen was cut, and investigators discovered both a razor blade and an empty box cutter handle in the apartment. Near the bathroom—where investigators believe McNamara died—investigators discovered a credit card bearing the name "Anthony Mertz." One block from McNamara's apartment, investigators discovered a knife in a dumpster covered in McNamara's blood. McNamara's roommate informed police that the knife was part of a set that she and McNamara kept in their kitchen.

Police eventually arrested Mertz for McNamara's murder. Mertz claimed that he had been drinking with friends the night that McNamara was killed, and that he could not remember anything after a certain point in the evening. In an initial interview with police, investigators noticed that Mertz

had scratches on his head and throat, bruises on his arm, and red knuckles; Mertz told police that he was injured after breaking a shot glass. Tests on DNA scrapings from underneath McNamara's fingernails were inconclusive, but did not exclude Mertz as a contributor. Multiple pairs of latex gloves were found in Mertz's apartment, and a box cutter went missing from his place of employment the day that McNamara was killed. In February 2003, a jury convicted Mertz of aggravated criminal sexual assault, home invasion, and first-degree murder in connection with McNamara's death. He was eligible for the death penalty because he committed the murder in the course of committing other felonies.

At sentencing, the government presented evidence that, prior to the McNamara murder, Mertz committed sexual and/or physical assaults on at least four other women, in addition to two men as well as two fellow inmates. The government put forth additional evidence that Mertz committed the unsolved and uncharged 1999 murder of a woman named Amy Warner. Mertz told friends—albeit in a joking manner—that he committed the crime, and also kept a newspaper article about the murder in his apartment. A witness also placed a car matching the description of Mertz's girlfriend's car at Warner's apartment on the night of her death. Additionally, the government drew a number of parallels between the McNamara and Warner murders. Officer Joe Siefferman testified at sentencing that both victims had their arms extended beyond their heads, both had injuries to their throats, and both appeared to be "posed" by their killers after their death. Both women were attacked on a Tuesday in June while they were asleep. No useful fingerprints were found at either crime scene.

The government also offered evidence that Mertz committed the unsolved and uncharged arson of Unique Apartments—a partially constructed apartment building located across the street from Mertz's home. It burned down in February 2000, but because of the damage to the structure, the cause of the fire could not be determined. However, the assistant fire chief testified that there was no source of ignition in the structure and that the rapid progression of the fire implied the use of an accelerant, suggesting a possible arson. Four of Mertz's friends heard Mertz claim responsibility for the fire. Mertz confirmed that he made these statements, but denied committing the crime.

Furthermore, the government submitted evidence that Mertz's computer contained nude photos of his former girlfriends, nude photos of female children, and bestiality photos. The jury heard further evidence that Mertz used the screen name "Cereal Kilr 2000," admired Hitler and Timothy McVeigh, and that his computer contained articles on racism and drug manufacture, as well as images of white pride symbols and Nazi flags.

In response to the government's aggravating evidence, Mertz's lawyers called twenty-five witnesses to offer mitigating testimony. The jury heard how Mertz lived in terrible conditions with his biological mother until the age of one, after which he and his three sisters went to live with their grandmother. When Mertz was in third or fourth grade, he went to live with his father and stepmother. Mertz's sisters testified that their stepmother occasionally beat them, and that their stepsister sexually molested them. After high school, Mertz entered the Marine Corps. While in the Marines, Mertz was treated for alcoholism; he was also promot-

ed to Corporal, but then demoted and court-martialed for using methamphetamine. He then received an honorable discharge. Mertz's lawyers also presented the testimony of two women with whom Mertz had relationships during his time in the Marines. Both testified that Mertz was not violent and that he wanted to attend college to become a history teacher.

The jury heard additional evidence that following his time in the Marines, Mertz attended Eastern Illinois University, where he continued to struggle with alcoholism. He sought help at several treatment centers where he was treated for drinking and depression. Mertz's lawyers also called a clinical forensic psychologist and mitigation specialist—Dr. Mark Cunningham—to testify that Mertz suffered from numerous developmental factors that increased his tendency to commit crimes. However, Mertz's lawyers did not offer any evidence to rebut the claims that Mertz committed the murder of Amy Warner or the arson of Unique Apartments.

**B. Procedural Background**

After just three hours of deliberation, the jury sentenced Mertz to death, as well as an additional sixty-year sentence for an exceptionally brutal home invasion. Mertz appealed his death sentence directly to the Illinois Supreme Court, which affirmed his sentence. Mertz then filed a state postconviction petition in the Coles County Circuit Court. Without an evidentiary hearing, the Circuit Court held that Mertz's constitutional rights were not violated. Mertz appealed the denial of his state postconviction petition directly to the Illinois Supreme Court. But before the Illinois Supreme Court heard Mertz's case, Governor Quinn commuted Mertz's death sentence to life imprisonment without the

possibility of parole, and Mertz's case was transferred to the Illinois Appellate Court. The Appellate Court then dismissed Mertz's appeal on the basis that, as a matter of Illinois law, Mertz's sentencing claims were moot because the Governor's commutation "removes the judicially imposed sentence and replaces it with a lesser, executively imposed sentence." *People v. Mertz*, No. 4-11-0247 (Ill. App. Ct. Sept. 9, 2011) (citing *People v. Williams*, 807 N.E.2d 448, 452 (Ill. 2004)).

Mertz filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the Northern District of Illinois alleging, among other things, that his trial counsel was ineffective at sentencing. The district court reviewed Mertz's ineffective assistance claim de novo, and found that even if Mertz's counsel was ineffective (an analysis in which the district court did not engage), Mertz did not demonstrate prejudice under *Strickland*. Mertz appeals.

## II. Discussion

We review the district court's denial of Mertz's habeas petition de novo and its factual findings for clear error. *Morales v. Johnson*, 659 F.3d 588, 599 (7th Cir. 2011).

### A. Application of 28 U.S.C. § 2254(d)

In reviewing a habeas petition, a district court generally may not grant relief on a claim that was previously adjudicated by a state court unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law," or was based on an unreasonable determination of facts. 28 U.S.C. § 2254(d)(1)–(2). However, if a state court did not adjudicate a claim on the merits, a district court reviews that claim de novo.

Mertz previously alleged the ineffective assistance of his sentencing counsel in a petition before the Coles County Circuit Court ("Circuit Court"). The Circuit Court addressed this claim on the merits and concluded that Mertz's constitutional rights were not violated. Still under a death sentence, Mertz appealed this decision to the Illinois Supreme Court. But while Mertz awaited an appeal in the Illinois Supreme Court, Governor Quinn commuted his sentence, and his case was transferred to the Illinois Appellate Court ("Appellate Court"). The Appellate Court then dismissed Mertz's sentencing claims as moot in light of his sentence commutation. The Appellate Court, therefore, did not adjudicate Mertz's claim on the merits, but also did not vacate the Circuit Court's decision, which *did* reach the merits of his ineffective assistance of counsel claim. Because of this, the government argued before the district court that the Circuit Court's judgment qualifies as a decision "on the merits" under § 2254(d).[1]

The district court disagreed, citing Illinois Supreme Court case *Felzak v. Hruby*, 876 N.E.2d 650 (Ill. 2007). In *Felzak*, the Illinois Supreme Court dismissed the party's appeal as moot, and further held:

> Because we do not reach the merits of the petition . . . we cannot speak to the correctness of the judgments rendered by the circuit and appellate courts in this matter. Accordingly, to prevent the appellate court's resolution of the

---

[1] Although the government did not appeal the district court's decision, it asks us to resolve the question of whether the district court's use of the de novo standard of review in this case was appropriate.

> issues presented to it from standing as prece-
> dent for future cases, we vacate the judgments
> of both the appellate and circuit courts.

*Id.* at 658 (internal quotation marks omitted). Based on *Felzak*, the district court reasoned that "a ruling by an appellate court that a case is moot deprives the lower court's decision on the merits of preclusive effect." *U.S. ex rel. Mertz v. Hardy*, No. 12 C 4174, 2013 WL 5163189, at *19 (N.D. Ill. Sept. 13, 2013).

However, the actions of the Appellate Court in Mertz's case are distinct from the actions taken by the Illinois Supreme Court in *Felzak*. In *Felzak*, the Illinois Supreme Court vacated the judgments of both the Appellate Court and the Circuit Court for the specific purpose of stripping both decisions of precedential value. The Appellate Court here took no such steps; instead it dismissed the suit due to mootness, but did not disturb the Circuit Court's original decision. Moreover, in *People v. Bailey*, the Illinois Supreme Court stated that an appellate court's dismissal of an appeal—rather than a decision to vacate a lower court's judgment— "effectively leaves the lower court's ruling on the merits undisturbed and intact." 4 N.E.3d 474, 482 (Ill. 2014). Furthermore, *Felzak* did not hold—as the district court implied— that when an appellate court dismisses an appeal for mootness, the case below is *automatically* vacated. Instead, *Felzak* cited *United States v. Munsingwear*, 340 U.S. 36, 39 (1950), for support, wherein the Supreme Court held that it was the "established practice," and even the "duty of the appellate court" "to reverse or vacate the judgment below and remand with a direction to dismiss" in the event that a case becomes moot while awaiting appellate review. Although the *Felzak*

court—in citing *Munsingwear*—paraphrased its holding by stating, "when an appeal is rendered moot through happenstance, the judgments of the courts below are vacated," 876 N.E.2d at 659, we are not persuaded that the Illinois Supreme Court intended this to mean that an appellate dismissal for mootness automatically vacates a lower court decision. Instead, we are convinced that if both the United States Supreme Court and the Illinois Supreme Court intended to hold that a dismissal for mootness automatically strips a lower court decision of preclusive effect, then neither court would have specifically instructed appellate courts to vacate and dismiss in these instances. Thus, we find that because the Appellate Court in Mertz's case failed to take such steps, the district court erred in holding that the Circuit Court's decision lacked preclusive effect under § 2254(d).[2]

Nevertheless, we do not remand back to the district court to apply the correct standard of review under § 2254(d). In reviewing Mertz's claim de novo, the district court afforded Mertz the most favorable standard of review possible, yet still concluded that his ineffective assistance of counsel claim lacked merit. To remand the case and ask the district court to apply a *less* favorable standard of review would certainly yield the same result. And since we agree with the district

---

[2] The district court also cited *Thomas v. Horn*, 570 F.3d 105 (3d Cir. 2009). In *Thomas*, the Pennsylvania Supreme Court reached a decision on a habeas petitioner's claims on "purely procedural, not substantive grounds," after a lower state court addressed the substance of the same claims. *Id*. at 115. The *Thomas* court decided that the Pennsylvania Supreme Court's decision stripped the lower court's substantive decision of any preclusive effect. *Id*. However, the opinion does not indicate whether the Pennsylvania Supreme Court simply dismissed the appeal, or whether it expressly vacated the lower court's judgment. *Id*.

court's assessment that Mertz's ineffective assistance claim fails under de novo review, we also conclude that his claim fails under the standard of review required by § 2254(d).

### B. Sentencing Counsel's Performance

*Strickland v. Washington*, 466 U.S. 668, 687 (1984), establishes a two-prong test for ineffective assistance of counsel claims: the defendant must first demonstrate that his counsel's performance was deficient, and second, that counsel's deficient performance prejudiced him. Mertz points to *Rompilla v. Beard*, 545 U.S. 374, 393 (2005), wherein the Supreme Court held that sentencing counsel's performance was deficient because of a failure to investigate a similar prior offense, which the government used as aggravation evidence. The *Rompilla* court held that "[t]he prosecution was going to use the dramatic facts of a similar prior offense, and Rompilla's counsel had a duty to make all reasonable efforts to learn what they could about the offense." *Id*. at 385.

Mertz argues that, like in *Rompilla*, the government in this case focused on the disturbing details of other offenses during sentencing, and that Mertz's sentencing counsel had a responsibility to respond to such arguments. However Mertz's case is quite distinct from *Rompilla*. In *Rompilla*, sentencing counsel did not just fail to rebut evidence of a prior offense, but failed to look at the defendant's prior conviction file altogether. Further, the file was a public record, and sentencing counsel knew that the government would use evidence of the defendant's prior felony convictions as an aggravating factor under state law. *Id.* at 383. Additionally, although Rompilla's sentencing counsel was aware of a potential substance abuse problem, "counsel did not look for evidence of a history of dependence on alcohol that might have

extenuating significance." *Id.* at 382. Unlike sentencing counsel in *Rompilla*, Mertz's sentencing counsel thoroughly investigated Mertz's struggles with substance abuse in an effort to present this information to the jury. Additionally, we find that the failure to rebut evidence of an uncharged prior offense cannot be easily compared to counsel's failure to examine a prior conviction file. *Strickland* indicates that "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" 466 U.S. at 689 (citing *Michel v. State of Louisiana*, 350 U.S. 91, 101 (1955)). It is unclear why Mertz's sentencing counsel did not rebut the evidence of the Warner murder and the Unique Apartments arson, but it *is* clear that Mertz does not overcome the presumption that this decision was one of "sound trial strategy."

Moreover, in *Pole v. Randolph*, we held that "[w]e assess counsel's work as a whole, and it is the overall deficient performance, rather than a specific failing, that constitutes the ground of relief." 570 F.3d 922, 934 (7th Cir. 2009) (internal quotation marks and citations omitted). Under this standard, sentencing counsel's overall performance was not deficient. Counsel called twenty-five mitigation witnesses, including Mertz's family members, former girlfriends, and a clinical forensic psychologist—Dr. Mark Cunningham—who offered testimony on a variety of issues. The jury heard firsthand accounts from Mertz's sisters about the circumstances of the siblings' upbringing, including the physical and sexual abuse they suffered at the hands of their stepmother and stepsister. Two of Mertz's former girlfriends testified—

contrary to testimony offered by other women who claimed that Mertz physically and sexually assaulted them—that Mertz was not violent during their respective relationships. Additionally, Dr. Cunningham testified about Mertz's genetic predisposition to alcoholism and depression, as well as the negative impact of the physical and emotional abuse that Mertz endured at the hands of his stepmother. These facts demonstrate that Mertz's sentencing counsel was thoughtful and thorough in building Mertz's mitigation case and that counsel's decision not to rebut the Warner and Unique Apartments evidence was—at the very least—not sufficiently egregious to taint her performance as a whole.

Mertz further argues that his sentencing counsel was deficient in failing to present a myriad of additional evidence, including: (1) evidence that his maternal uncle was a drug addict and a "mentally disturbed individual" who committed a violent robbery; (2) evidence that Mertz attempted suicide after he was arrested for a DUI six months prior to the McNamara murder; (3) medical records from the Veterans Administration Medical Center Pharmacy showing that Mertz refilled his prescriptions for anti-depressant medications the day before McNamara's murder; and (4) an expert witness to determine whether Mertz's combined use of alcohol and anti-depressant medication brought about a state of involuntary intoxication, showing Mertz's diminished mental state.

First, we find that the evidence pertaining to Mertz's maternal uncle would have been cumulative of the evidence already presented to the jury on the topics of Mertz's substance abuse and family history. In *Bobby v. Van Hook*, the Supreme Court addressed the issue of cumulative mitigation

testimony, stating, "[T]here comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties." 558 U.S. 4, 11 (2009). We find these principles applicable here, and hold that Mertz's counsel was not deficient in failing to present evidence about Mertz's maternal uncle.

Next, Mertz claims that his sentencing counsel was ineffective for failing to introduce evidence of medical records and incident reports about his attempted suicide, because outside of his own testimony about the attempt, no corroborating documentation was presented. We find that these records would have been cumulative of Mertz's own testimony, and that counsel's failure to introduce them was not so flawed as to taint her overall performance during sentencing. As mentioned above, sentencing counsel introduced considerable evidence relating to Mertz's family background, substance abuse, struggle with depression, and indeed, even his suicide attempt six months prior to the McNamara murder. The mere fact that additional documents would have corroborated Mertz's testimony does not support a conclusion that his sentencing counsel performed deficiently by not introducing them.

Finally, Mertz's arguments relating to his use of anti-depressants in close proximity to the McNamara murder are waived. The district court entertained Mertz's argument that his counsel was ineffective for failing to offer certain evidence that he was involuntarily intoxicated when he committed the murder. This evidence included the fact that Mertz filled an anti-depressant prescription right before the murder, as well as a psychiatrist's report indicating that

Mertz may have been susceptible to violent episodes as a result of combining anti-depressants and alcohol. *Mertz*, 2013 WL 5163189, at *15. The district court concluded that this claim was procedurally defaulted, and that Mertz could not demonstrate an appropriate excuse for such default.[3] Although Mertz now argues that similar evidence should have been presented during mitigation—rather than as an affirmative defense—arguments in a federal habeas petition which were not raised to the district court are not properly raised for the first time on appeal. *Sanders v. Cotton*, 398 F.3d 572, 583 (7th Cir. 2005) (citing *Perry v. Sullivan*, 207 F.3d 379, 383 (7th Cir. 2000)). As such, Mertz may not rely on this same evidence for a renewed purpose. We therefore conclude that Mertz's sentencing counsel was not deficient.

### C. *Strickland* **Prejudice**

We also agree with the district court that, regardless of whether sentencing counsel's performance was deficient, Mertz does not establish the necessary prejudice under *Strickland*. When a defendant challenges his sentence under *Strickland*, he must show that, but for counsel's deficient performance, a reasonable probability exists that he would have received a different sentence. *Griffin v. Pierce*, 622 F.3d 831, 844 (7th Cir. 2010) (citing *Strickland*, 466 U.S. at 694). "Courts assess that probability by evaluating the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweighing it against the evidence in aggravation." *Id.* (internal quo-

---

[3] The district court did not issue a certificate of appealability on this issue, which prevents us from exercising jurisdiction over the claim. *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).

tation marks and citations omitted). Finally, the Supreme Court has noted that the probability of a different result—in this case, a different sentence—"must be substantial, not just conceivable." *Harrington v. Richter*, 131 S. Ct. 770, 792 (2011).

In Mertz's case, the district court acknowledged that in order to establish *Strickland* prejudice, Mertz needed to show that but for his counsel's deficient performance, he would have received a term of years sentence, rather than his current sentence of life without the possibility of parole. *See Mertz*, 2013 WL 5163189, at *19. Mertz argues that the district court erred in this respect; he argues that the standard should have been whether, but for counsel's errors, he would have received a sentence other than death. However, our precedent forecloses Mertz's argument. In *Richardson v. Lemke*, 745 F.3d 258 (7th Cir. 2014), we recently considered a habeas petition alleging ineffective assistance of counsel at a capital sentencing hearing where the petitioner's sentence—like Mertz's sentence—was commuted to life imprisonment without the possibility of parole. In describing the *Strickland* standard, we stated:

> By the time Richardson's ineffective-assistance-at-sentencing claim was decided by the district court, his sentence had been commuted to life in prison without the possibility of parole. But that did not necessarily render the claim moot; Richardson would still be entitled to relief if adequate representation would have resulted in a sentence to a term of years.

*Id.* at 267. Therefore, the district court correctly used a term of years sentence as the benchmark for *Strickland* prejudice in Mertz's case.

Furthermore, we agree with the district court's conclu-
sion that Mertz does not prove *Strickland* prejudice even as-
suming counsel's performance was deficient. Mertz was eli-
gible for the death penalty because he murdered McNamara
in the course of committing other felonies (home invasion
and aggravated sexual assault). When Mertz was sentenced,
the jury was first charged with voting on the question of
whether the death penalty was appropriate; in the event that
the jury did not vote unanimously to issue the death penalty,
then the trial judge would have issued Mertz's sentence. 720
Ill. Comp. Stat. 5/9-1(g) (West 2010). We hold that no reason-
able probability exists that the trial judge would ultimately
have sentenced Mertz to anything less than what he current-
ly serves had sentencing counsel rebutted the evidence of
the Warner murder and the Unique Apartments arson.
While this evidence was certainly aggravating, it was far
from the only aggravation evidence presented. Both the jury
and the trial judge heard evidence that Mertz broke into
McNamara's home by cutting her bedroom window screen
with a box cutter; he killed her by shoving a washcloth in
her mouth, cutting her abdomen, back, and genitals with a
kitchen knife, and lacerating her liver with severe blunt
force. The government also presented a host of other trou-
bling evidence, including evidence that Mertz had a history
of committing violent assaults on women; that he sympa-
thized with figures such as Hitler and Timothy McVeigh;
that he kept images of Nazi flags, white pride symbols, and
nude photos of children on his computer; and that he used
the screen name "Cereal Kilr 2000." In reweighing the evi-
dence that Mertz now presents—evidence rebutting the alle-
gations that Mertz committed the Warner murder and the
Unique Apartments arson, as well as additional information

about Mertz's family history, depression and substance abuse—against the aggravation evidence which was presented, we cannot conclude that a substantial probability exists that Mertz would have received a lower sentence than the one he now serves.[4] Hence, we agree with the district court's *Strickland* prejudice analysis.

### III. Conclusion

For these reasons, we AFFIRM the district court's ruling.

---

[4] We note that even if Mertz's counsel had attempted to contradict the assertion that Mertz committed the Warner murder and the Unique Apartments arson, this does not mean that the sentencer would have been barred from considering the evidence which supported the theory that Mertz *did* commit these uncharged crimes; this evidence included the fact that Mertz told friends that he murdered Amy Warner and that he was responsible for the Unique Apartments fire.