In the

# United States Court of Appeals

## For the Seventh Circuit

No. 20-3260

JAMES WESTRAY,

*Petitioner-Appellant,*

*v.*

DEANNA BROOKHART,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:19-cv-00728 — **Nancy J. Rosenstengel**, *Chief Judge.*

ARGUED OCTOBER 27, 2021 — DECIDED JUNE 10, 2022

Before MANION, WOOD, and BRENNAN, *Circuit Judges.*

BRENNAN, *Circuit Judge.* James Westray pleaded guilty to
the murder of Elizabeth Opatt. He received a death sentence
which was later commuted to life imprisonment. In a habeas
petition under 28 U.S.C. § 2254, he now challenges his con-
finement, including its duration. He argues he received inef-
fective assistance of counsel during sentencing and on
remand when he moved to withdraw his guilty plea. Accord-
ing to Westray that claim also requires an evidentiary hearing.

For the reasons below, we affirm the district court's denial of these claims.

## I. Background

### A. The Underlying Crime

Elizabeth Opatt worked at Hurley's Show Bar in Williamson County, Illinois. One morning in August 1998, she was opening the bar by herself when two men, James Westray and Keith Cook, walked in. Westray ordered a drink.

Unknown to Opatt, the men were armed with concealed sawed-off shotguns and planning to rob the bar. When Opatt turned her back, Westray leapt over the counter and forced her to the ground with his gun. Cook locked the front door and guarded Opatt, who by that point was "laying facedown, basically spread-eagled." This left Westray free to break into the back office. After a minute or two, Westray emerged with a rifle and two boxes, one of which contained money. Meanwhile, Opatt remained on the floor in the same position.

According to Cook, Westray then found a broom and, with its handle, began to choke Opatt. He threatened her and demanded that she give him a set of keys to the building. Eventually Opatt stopped moving, either because she had passed out or because she was pretending to be unconscious. Westray found the keys and the two men looked for a way out as they were "done" robbing the place.

Cook and Westray dispute what happened next. Per Cook, Westray told him they "were going to have to shoot" Opatt because she had seen their faces. He suggested they "shoot her at the same time," in order to implicate themselves simultaneously. Westray "counted to three" while Opatt laid motionless "in the same spot" on the floor. He then shot Opatt in

the back of the head. "Almost simultaneously," but "immediately after," Cook pulled his trigger and fired a second shot. According to Westray, Cook shot Opatt first, and Westray shot her second solely to implicate himself in the crime as part of the "code among criminals." The two men fled.

Ten days later, Westray and Cook met with an associate who was cooperating with police. During that meeting, they planned another armed robbery. Westray said he would "shoot the lady at the register" and kill a coconspirator to obtain a greater share of the proceeds. When the police confronted them after the meeting, Westray fled. He was later discovered "laying in … some grass behind a building about a block away." He was generally "defiant and noncompliant" throughout the arrest and "refused to show [the] police officers his hands."

Two months later, while awaiting trial, Westray tried to escape from jail. He managed to climb through the jail's ductwork and make it to the roof, where he was discovered by a maintenance worker and eventually confronted by jail officials. When confronted, Westray jumped off the roof, falling three stories and injuring himself upon impact. He was then caught and hospitalized.

### B. Guilty Plea and Sentencing

Westray was charged with a series of crimes for the shooting of Elizabeth Opatt. He was represented by Attorney Larry Broeking throughout his plea and sentencing proceedings. Westray entered an open guilty plea[1] to the charges of first-

---

[1] "[A] plea made by the defendant without the benefit of a plea agreement entered into with the Government." *United States v. Mansfield*, 21

degree murder and felony murder. Cook also pleaded guilty to first-degree murder, but he did so in a negotiated plea, which included an agreement to testify against Westray.

At the time Westray was sentenced, the state of Illinois used a two-phase process in death penalty cases. 720 ILCS 5/9-1 (1998). During the first phase, the jury determined "whether someone [was] eligible for the death penalty." *People v. Todd*, 607 N.E.2d 1189, 1198 (Ill. 1992). This step was "nonweighing," meaning the defendant would be eligible for death if the jury unanimously found "at least one valid aggravating factor." *Id.* But if the jury found there were no enumerated aggravating factors, then the court "sentence[d] the defendant to a term of imprisonment." 720 ILCS 5/9-1(g) (1998).

If the "defendant [was] found eligible for the death penalty," the jury proceeded to the second phase. *Todd*, 607 N.E.2d at 1198. At this phase, the jury weighed the aggravating and mitigating factors to "determine whether the death sentence should in fact be imposed." *Id.* The Illinois Supreme Court "consistently held that the sentencing body [was] free" during this step "to consider any relevant and reliable evidence in aggravation and mitigation, including the brutal and heinous manner in which the defendant murdered his victim." *Id.* (citation omitted). "If the jury determine[d] unanimously that there [were] no mitigating factors sufficient to preclude the imposition of the death sentence, the court [would] sentence the defendant to death." 720 ILCS 5/9-1(g) (1998).

---

F.4th 946, 951 n.2 (7th Cir. 2021) (alteration in original) (quoting *United States v. Booth*, 432 F.3d 542, 543 n.1 (3d Cir. 2005)).

Here, the jury found Westray eligible for the death penalty because he murdered Opatt during a robbery. *Id.* 5/9-1(b)(6)(c) ("A defendant who … has been found guilty of first degree murder may be sentenced to death if: … (6) the murdered individual was killed in the course of another felony if: … (c) the other felony was one of the following: armed robbery, armed violence, robbery.") The jury therefore proceeded to the aggravation-and-mitigation phase.

This second phase spanned three days, during which the State presented aggravation evidence from nine witnesses. The witnesses testified primarily to Westray's extensive criminal history. For example, the State presented evidence that when Westray was 18 years old he participated in a crime spree as part of a group of young men "recruited" to steal. His involvement included shooting a man and injuring a woman during an attempted armed robbery, burglarizing three residences and a hardware store, and discharging a firearm toward an occupied Illinois home. Eventually, Westray cooperated with police, assisting them in their investigation of the group. He later pleaded guilty to attempted robbery, aggravated battery, and armed violence and was sentenced to six years in prison.

The State also presented evidence that between 1997 and 1998, Westray committed two armed robberies before the murder of Opatt, and that he planned to commit a fourth afterward. This evidence included Westray's statements volunteering to "shoot" and kill multiple people associated with the robbery. Finally, the State presented evidence that Westray was noncompliant when confronted by police, showed no remorse for his actions during a subsequent custodial interrogation, and attempted to escape from jail after his arrest.

Next, defense attorney Broeking presented mitigation evidence. He called three witnesses to the stand: Westray, Westray's mother, and a friend of Westray's from high school. Westray's mother, Claudine Kalaboke, testified first. Among other things, she testified that Westray did not know his biological father growing up, and that Westray's stepfather was "physically" and "mentally" abusive to him. She recounted one occasion on which Westray's stepfather hit him so hard he fell on a recliner and broke the back of the chair while "beat[ing] him." At least twice the abuse was so severe that Children and Family Services had to intervene. Despite these issues at home, Westray was able to develop a good relationship with one of his half-brothers. Kalaboke also testified generally about Westray's marriage, children, and the different jobs he had held. The State declined to cross-examine Kalaboke.

Beth Ann Kern, Westray's high school friend, testified next. She said that "it was common knowledge that [Westray] had an abusive childhood" and an "abusive life at home." Kern also explained that she intersected with Westray later in life when he became involved in the drama ministry at her church. That ministry, Kern said, was used "to introduce people to the word of God and to bring people to God through plays and comedy." When asked whether Westray had an "aptitude" for the drama ministry, Kern responded: "He was called to do that by God. That is his—that's what he's to be doing, is to reach people for Christ." Kern also mentioned Westray's departure from the church and his marital struggles. The State again declined to conduct cross-examination.

Westray took the stand as the final mitigation witness. He testified about his abusive childhood, prior criminal activity,

and subsequent cooperation with the police. He also discussed his family, his attempts to rehabilitate his life, and his eventual return to crime. Finally, Westray testified about codefendant Cook's role in the alleged crimes and his own remorse for his actions. He said he was "ashamed" for what happened and claimed he could not "even look people in the face" knowing what he "did to [Opatt's] family," as well as his own. For a third time, the state declined to question the witness.

The hearing proceeded to closing arguments. The State emphasized Westray's criminal history, his attempts to elude arrest and escape from jail, and his general lack of remorse. On this last point, the State argued Westray still had "no legitimate remorse" when he took the stand at trial. Rather, his attitude toward the crime and his decision to flee from the police "show[e]d a lot more about him than [the] act that he put on at the end" of his testimony "trying to convince" the jury "he was so sorry about what he had done."

Broeking made a closing argument on Westray's behalf. Among other things, he discussed Westray's troubled childhood, his criminal history, and the reforms he had made throughout his life. Broeking also sought to rebut the State's claim that Westray's remorse was merely an act. He told the jury they were "the ones that decide whether what [they] saw from [Westray] was some act or what [they] saw from [Westray] was how [he] feels." As evidence of Westray's remorse, Broeking pointed out that Westray pleaded guilty because he had "no desire to put" Opatt's family "through any of this." He had accepted responsibility for his actions by admitting guilt and taking the stand to testify about Cook.

Finally, the State offered its rebuttal argument. The State focused on Westray's lack of personal responsibility and remorse. For example, it argued that Westray's troubled childhood and divorce were simply an "abuse excuse." Westray, the State urged, should start taking "responsibility for [his] own actions and quit trying to blame other people." The State doubled down on its argument that Westray's alleged remorse was nothing more than an act, citing his past involvement in "[d]rama" and "[a]cting," and stating that Westray "does have some talent." More broadly, though, the State emphasized that Westray had a long criminal history and he needed to be held accountable for his actions.

After a full day of deliberation, the jury found unanimously that there were "no mitigating factors sufficient to preclude imposition of a death sentence." The court therefore sentenced Westray to death.

## C. First Direct Appeal and Remand

Westray appealed directly to the Illinois Supreme Court, arguing, in part, that he had not been properly advised of his appeal rights in accordance with Illinois Supreme Court Rule 605(b). The State conceded Westray was not properly admonished, and the case was remanded to the trial court in September 2000.

On remand Westray had new legal representation, Brian Lewis. After the trial court gave the instructed admonishments, Lewis filed a motion to withdraw Westray's guilty plea. As amended, the motion stated:

> NOW COMES the Defendant, JAMES L. WESTRAY, by and through his counsel, BRIAN D. LEWIS, and pursuant to Ill. Sup.

Ct[.] Rule 604(d), hereby respectfully re-
quests this Court to allow him to withdraw
his plea of guilty to the charge of murder,
made on November 6, 1998, and in support
thereof, hereby states as follows:

1.  The Defendant's plea of guilty was
not knowingly and voluntarily made, be-
cause the Defendant was acting on a mis-ap-
prehension [sic] of the facts and the law.

2.    The Defendant, JAMES L.
WESTRAY, was denied the effective assis-
tance of trial counsel, because trial counsel
failed to conduct a reasonable investigation
into mitigation evidence and circumstances
of the Defendant.

WHEREFORE, Defendant, JAMES L.
WESTRAY, respectfully requests this Court
to allow him [to] withdraw his plea of guilty,
entered in this case, and to set the case for
jury trial.

At a July 2001 hearing on this amended motion, Lewis
called Westray to the stand. Westray testified that when he
entered his guilty plea, he did not understand he was "admit-
ting to being the person who actually committed the murder."
According to Westray, he also did not know the State "would
be able to argue that [he] had admitted to being the cause of
death of Miss Opatt" afterward. Based on Broeking's explana-
tion of "accomplice theory," Westray believed he was "plead-
ing to facts that would show that Keith Cook was the actual
killer." Additionally, had he been aware of additional

evidence, such as the coroner's report and a statement made by Cook's wife implicating Cook, he would not have entered his plea. Both cross-examination and redirect examination focused on Westray's knowledge and understanding of the guilty plea.

Attorney Broeking testified next. Broeking stated he had reviewed the evidence with Westray and informed him of the penalties that could accompany a guilty plea. According to Broeking, "early on" in his representation of Westray, he explained that Westray's claim that he shot Opatt "a fraction of a second" after Cook could be an admission to felony murder that would potentially subject him to the death penalty. He also counseled Westray that "his best chance" of avoiding the death penalty was to plead guilty, but he did not tell him such a result was "probabl[e]." Broeking's legal theory was that given the "serious aggravating factors," the "less a jury saw and heard about the crime, the better off" Westray would be. Broeking testified that Westray ultimately chose to plead guilty.

The court denied Westray's amended motion to withdraw his guilty plea. Although the court provided no explanation for its decision, neither party objected or had anything further to add.

### D.  Second Direct Appeal, Commutation of Sentence, and Postconviction Proceedings

Westray appealed to the Illinois Supreme Court for a second time. While his appeal was pending, then-Governor George Ryan commuted Westray's death sentence to a sentence of natural life in prison. The Illinois Supreme Court initially dismissed Westray's appeal but then transferred the

case to the Illinois Appellate Court. Before that court, Westray argued again that his plea was not knowing or intelligent. But the state appellate court rejected his arguments and affirmed the order denying his motion to withdraw his guilty plea. Westray petitioned for leave to appeal to the Illinois Supreme Court, which was denied in January 2009.

Four years later, Westray filed an amended postconviction petition in state court through appointed counsel. Before the state trial court, Westray argued that Broeking was ineffective for failing to investigate and present available evidence in mitigation during sentencing, and that Lewis was ineffective for failing to raise that claim against Broeking on remand. He argued further that the commutation of his death sentence did not render his case moot. The state trial court disagreed and dismissed the postconviction petition. That court concluded that the Governor's commutation rendered moot Westray's claim of ineffective assistance of counsel during sentencing.

Westray appealed the dismissal of his postconviction petition to the Illinois Appellate Court. The court affirmed the state trial court on mootness grounds. In doing so it relied on *People v. Lucas*, an Illinois Supreme Court case which stated that the commutation of a death sentence renders moot any sentencing challenges resulting from errors at the aggravation-and-mitigation sentencing stage. *See* 787 N.E.2d 113, 119 (Ill. 2002). About five months later, the Illinois Supreme Court denied Westray's petition for leave to appeal.

In 2019, Westray filed a pro se federal habeas petition under 28 U.S.C. § 2254, asserting the same two ineffective assistance claims. He then requested an evidentiary hearing. After determining that an evidentiary hearing was unnecessary, the district court denied the petition. But the court granted a

certificate of appealability on the claim that trial counsel Broeking was ineffective for failing to investigate and present mitigating evidence of his abusive childhood. Although the court was "satisfied that its conclusions [were] correct," it was "possible that a reasonable jurist could conclude that the state trial court's denial of the ineffective assistance claim … without stating any reasoning, either should not be entitled to deferential review or amounted to an incorrect or unreasonable application of *Strickland*."

Westray appealed, and this court appointed counsel.[2] Our court then granted appointed counsel's request to expand the certificate of appealability to include the following issues: "(1) whether we should remand the case to the district court for an evidentiary hearing on Westray's theories; and (2) whether the lawyer who filed Westray's post-sentencing motion to withdraw his guilty plea rendered ineffective assistance by not also requesting resentencing on the basis of plea-and-sentencing counsel's ineffectiveness."

## II. Ineffective Assistance of Trial Counsel

We first review whether Westray is entitled to habeas relief for his claim that trial counsel was constitutionally ineffective by failing to investigate and present additional mitigating evidence regarding his abusive childhood. We review "a district court's denial of a petition for habeas corpus *de novo* and findings of fact for clear error." *Felton v. Bartow*, 926 F.3d 451, 464 (7th Cir. 2019) (citation omitted).

---

[2] We thank Westray's court-appointed counsel J. Benjamin Aguiñaga, Noel J. Francisco, and Brett J. Wierenga of Jones Day for their excellent advocacy on his behalf.

### A. AEDPA Deference

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court owes substantial deference to a state court's decision on a state prisoner's federal claims. 28 U.S.C. § 2254(d)(1), (2). Our court will not set the state court's decision aside unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.*; *see Hartsfield v. Dorethy*, 949 F.3d 307, 312 (7th Cir. 2020).

A threshold question for us is whether the district court correctly applied AEDPA's deferential standard. This benchmark "is deliberately difficult, setting a high bar for relief; the prisoner must demonstrate that the state court's ruling was 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Adorno v. Melvin*, 876 F.3d 917, 921 (7th Cir. 2017) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). It "demands that state-court decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam); *see Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). And the petitioner bears the burden of proof. *Pinholster*, 563 U.S. at 181. Importantly, AEDPA deference applies only to claims that were "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d); *see Minnick v. Winkleski*, 15 F.4th 460, 467 (7th Cir. 2021), *cert. denied*, No. 21-1042 (U.S. Mar. 21, 2022) (citation omitted). Otherwise, our review is de novo. *Cone v. Bell*, 556 U.S. 449, 472 (2009); *Adorno*, 876 F.3d at 921.

The Supreme Court has instructed that "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington*, 562 U.S. at 99. Additionally, when a "state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume" the same. *Johnson v. Williams*, 568 U.S. 289, 301 (2013). This is known as the *Harrington* presumption, under which a federal court will presume a state court adjudicated a claim on its merits in the absence of an indication to the contrary, or when the claim has not expressly been addressed. This presumption "can in some limited circumstances be rebutted." *Id.* For example, "[w]hen the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to an unencumbered opportunity to make his case before a federal judge." *Id.* at 303.

So, the question is whether a state court adjudicated Westray's claim that Broeking provided ineffective assistance of counsel during sentencing on the merits. On federal habeas review, the district court applied AEDPA deference after it concluded the claim was raised in Westray's amended motion. That motion made two claims: (1) Westray's guilty plea was neither knowing, nor voluntary; and (2) Westray was denied the effective assistance of trial counsel. This second claim, the district court reasoned, referred to Broeking's performance at sentencing. Because the state trial court denied the amended motion without comment, the district court presumed, under *Harrington*, that the claim was adjudicated on its merits. Westray submits the district court erred because his

ineffective assistance claim referred solely to Broeking's performance during plea proceedings, not during sentencing.

We agree with the district court's analysis and characterization of the amended motion for several reasons. First, the text of the amended motion states that Westray's second claim challenged the effectiveness of trial counsel during sentencing:

> 2. The Defendant, JAMES L. WESTRAY, was denied the effective assistance of trial counsel, because trial counsel failed to conduct a reasonable investigation into mitigation evidence and circumstances of the Defendant.

The phrase "reasonable investigation into mitigation evidence" regularly refers to the mitigation-and-aggravation stage of a sentencing proceeding. That expression rarely describes the pleading stage of a trial. Therefore, based on the plain text of his amended motion, Westray has raised his ineffective assistance of counsel claim before a state court.

Second, Westray's arguments on federal habeas review support this understanding. Before our court, Westray argues he is entitled to habeas relief because, among other things, trial counsel:

> said mitigation would not make a difference; he passed off his duty to investigate [a potential witness]; he brought a grand total of one witness to sentencing; he refused to obtain readily available records and to interview witnesses flagged for him; and in a costly move, he put [Beth Ann] Kern on the stand even though he had never interviewed her.

In other words, Westray argues before this court that his trial counsel failed to conduct a reasonable investigation into mitigation evidence for sentencing. This argument matches the language used in the amended motion. Westray has not provided an alternative explanation for the meaning of this text.

Third, courts within our circuit have consistently used the phrase "mitigation evidence" to refer to sentencing proceedings, not plea proceedings. A review of 155 criminal and habeas cases from this circuit dating back to 1996 shows that all but one of them used the phrase "mitigation evidence" to refer to sentencing or sentencing proceedings. On the other hand, in only two unreported orders did a court use "mitigation evidence" to refer to the stage of the proceeding adjudicating guilt or innocence.[3] Importantly, both of these cases had distinguishing circumstances—one used the phrase in reference to an insanity defense, and the other used it to describe inculpatory evidence that later overlapped with sentencing evidence. Even more to the point, of the cases reviewed, every case from the Southern District of Illinois used "mitigation evidence" exclusively in the sentencing context. This review is not necessarily exhaustive, but it is representative.[4] Judges overwhelmingly use and understand the phrase

---

[3] The unpublished orders are *United States v. Christensen*, No. 17-cr-20037, 2019 WL 1569348 (C.D. Ill. Apr. 11, 2019), and *Ballard v. Pierce*, No. 06 C 711, 2006 WL 1519580 (N.D. Ill. May 30, 2006). For purposes of our research, the second case is counted twice, once for sentencing and once for guilt.

[4] The review was limited to the phrase "mitigation evidence" in the criminal and habeas corpus context. It did not account for variations of the word "mitigation" or its use in the civil context, for example.

"mitigation evidence" to refer to sentencing rather than plea proceedings.

Fourth, the judiciary's use of "mitigation evidence" aligns with the ordinary use of that phrase. For example, as a legal term, "mitigation" is defined as "[t]he portrayal of a crime, mistake or misjudgment as being less than complete, as by pointing to other contributory causes or to the person's own background of adversity as a factor." *Mitigation*, BLACK'S LAW DICTIONARY (11th ed. 2019);[5] *see* BRYAN A. GARNER, GARNER'S DICTIONARY OF LEGAL USAGE 584 (3d ed. 2011) ("mitigate" means "to make less severe or intense"). Outside of law, "mitigation" means "the action of reducing the severity, seriousness, or painfulness of something." *Mitigation*, NEW OXFORD AMERICAN DICTIONARY (3d ed. 2010) (the phrase "in mitigation" is used to "make something esp[ecially] a crime, appear less serious and thus be punished more leniently"); *see Mitigate*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003) ("to make less severe or painful"). Each definition indicates that "mitigation evidence" would be used to lessen the portrayed severity of a crime, not to adjudicate an individual's culpability. That is, in a trial, "mitigation" better describes the sentencing stage than the guilt stage. Westray has failed to rebut this usage or present an explanation of how the phrase could be used to describe plea proceedings.

Fifth, the Supreme Court's case law presumes that a claim was adjudicated on its merits if it was properly raised before a state court. *Johnson*, 568 U.S. at 301. So, if a claim is presented

---

[5] Black's Law Dictionary also defines "mitigation" as "[a] reduction in how harmful, unpleasant, or seriously bad a situation is; a lessening in severity or intensity." *Id.*

before a state court and dismissed without explanation, the dismissal is still entitled to AEDPA deference on federal habeas review, provided that evidence does not clearly indicate the claim was overlooked by the state court. *Id.* at 303. Here, Westray does not claim the state court overlooked the amended motion's second claim, nor does he present any evidence to rebut the *Harrington* presumption. Instead, Westray argues only that the ineffective assistance claim must have referred to his guilty plea because that is what the amended motion sought to withdraw. For the reasons stated above, we do not agree with Westray's cramped interpretation of the amended motion. It would be perfectly reasonable for counsel to submit a motion to withdraw a guilty plea that includes an alternative claim regarding sentencing. The text of the motion, the common usage of the phrase "mitigation evidence," and Westray's arguments in support of habeas relief confirm this understanding.

Supreme Court precedent generally instructs federal courts to afford state courts deference. That is because the "AEDPA recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 571 U.S. 12, 19 (2013); *see Minnick*, 15 F.4th at 468 ("AEDPA's strictness is grounded in comity.") Federal courts "reviewing state criminal convictions on collateral review" are "required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam). The presumption that state courts know and follow the law is "particularly true when state courts adjudicate ineffective assistance of counsel claims." *Minnick*, 15 F.4th at 468 (citing *Titlow*, 571 U.S. at 19). Considering this precedent and the record before us, the

district court correctly concluded that when the state court denied Westray's motion to withdraw his guilty plea, the state court adjudicated Westray's ineffective assistance of trial counsel claim on the merits. This ineffective assistance claim referred to trial counsel's performance during sentencing. It is not our role to "second-guess" the state court's reasoning after the fact. *Makiel v. Butler*, 782 F.3d 882, 896 (7th Cir. 2015) (citation omitted).

For these reasons, we conclude that the ineffective assistance of trial counsel claim was presented to the Illinois trial court in Westray's amended motion. The state court then denied the amended motion without comment. It is therefore presumed that the claim was adjudicated on its merits and AEDPA deference applies. As a result, the state court's decision is not set aside unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

## B. Commutation

Next, we consider the proper legal framework under which to consider Westray's claim of ineffective assistance of trial counsel. Specifically, we examine how the commutation of Westray's sentence from death to life imprisonment affects how we apply the legal standard.

To prevail on an ineffective assistance of counsel claim, a petitioner must show both deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A petitioner needs to demonstrate that: (1) "counsel's representation fell below an objective standard of

reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 687–88, 694. "A petitioner is entitled to habeas relief only if he satisfies both of *Strickland*'s prongs." *Karr v. Sevier*, 29 F.4th 873, 880 (7th Cir. 2022) (quoting *Thill v. Richardson*, 996 F.3d 469, 476 (7th Cir. 2021)). Importantly, "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

In keeping with this precedent, we assess whether Westray can satisfy *Strickland*'s prejudice prong. Before that, though, we must understand how the commutation of his sentence impacts the applicable legal standard. In a death penalty case, prejudice occurred if "there is a reasonable probability that, but for [the] counsel's ineffectiveness, the jury would have made a different judgment about whether [the petitioner] deserved the death penalty as opposed to a lesser sentence." *Andrus v. Texas*, 140 S. Ct. 1875, 1885–86 (2020) (citations omitted).

The question for us then is whether a commutation alters the prejudice inquiry. The State argues that when a "death sentence is subsequently commuted to life imprisonment," a petitioner "must show not only a reasonable probability that the jury would not have found death to be the appropriate sentence, but also a reasonable probability that the judge would have then sentenced him to a term more favorable than life imprisonment." To do so the State relies on pair of cases from this court: *Richardson v. Lemke*, 745 F.3d 258 (7th Cir. 2014), and *Mertz v. Williams*, 771 F.3d 1035 (7th Cir. 2014).

Westray, on the other hand, argues that under the prejudice prong he need show only that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland*, 466 U.S. at 694. He relies on an earlier case from this court, *Griffin v. Pierce*, 622 F.3d 831 (7th Cir. 2010), to argue that despite the commutation, he needs to show only that but for his counsel's ineffective assistance, he would have been sentenced to less than death.

In *Griffin*, this court considered a petitioner's claim that "his counsel was ineffective for failing to investigate and present" several pieces of "mitigation evidence" at sentencing. *Id.* at 838. The petitioner was sentenced to death after being convicted for murder, solicitation to commit murder, and conspiracy to commit murder. *Id.* at 833. But his sentence was later commuted to life imprisonment. *Id.* at 837. The court ruled that the commutation did "not moot the habeas petition" because the petitioner still could have sought "a lower sentence." *Id.*

How the commutation affects the prejudice analysis was never squarely presented to the court in *Griffin*. When evaluating prejudice, *Griffin* determined that the Illinois Supreme Court had unreasonably applied *Strickland* because "[t]he question is not whether a particular judge would have imposed a different sentence, but rather whether there was a 'reasonable probability' that the sentence would have been different." *Id.* at 845–46. After identifying several errors—including counsel's failure to investigate and to proffer evidence, and the Illinois Supreme Court's failure to properly evaluate the totality of the mitigation evidence—the court reversed the district court's denial of the habeas petition. *Id.* at 844–46.

Four years later in *Richardson*, this court addressed the question more directly. There, a petitioner appealed, among other things, the "district court's denial of his claim that he received ineffective assistance of counsel during the sentencing phase." *Richardson*, 745 F.3d at 276. As in *Griffin*, the petitioner's sentence had been commuted to life in prison without the possibility of parole. *Id.* This court noted that the commutation did not necessarily render the petitioner's claim moot because the petitioner was still "entitled to relief if adequate representation would have resulted in a sentence to a term of years." *Id.*

The court affirmed the "denial of [the petitioner's] claim because a reasonable jurist could certainly conclude, as did the Illinois Supreme Court, that the introduction of the evidence [the petitioner] sought would not have changed the sentence handed down by the trial court." *Id.* at 277 (citing *Strickland*, 466 U.S. at 694; *Griffin*, 622 F.3d at 844). In doing so, the court noted that "due to the commuting of his sentence, [the petitioner] would not be entitled to relief unless the trial court would have handed down a sentence to a term of years." *Id.* at 277 n.9. Under *Strickland*'s prejudice prong, the court reasoned, the petitioner would need to show he would have received less than life imprisonment had his counsel effectively assisted him. *See id*.

Later that year in *Mertz*, this court considered another *Strickland* claim from an Illinois prisoner whose sentence had been commuted to life imprisonment without the possibility of parole. 771 F.3d at 1037. The court affirmed the district court's denial of the habeas claim because the petitioner "could not show the necessary prejudice" under *Strickland*. *Id.* Relying on the recent decision in *Richardson*, this court

decided that the "district court correctly used a term of years sentence as the benchmark for *Strickland* prejudice in Mertz's case." *Id.* at 1044. Once again, the court applied *Strickland*'s prejudice prong in this commutation context to require that a petitioner show he would have received a sentence of less than life imprisonment but for the ineffectiveness of his counsel.

*Richardson* and *Mertz* provide the proper framework to apply the prejudice analysis following a commutation. These cases are more recent than *Griffin* and they directly address the question at hand. Westray contends the State's position fails as a matter of constitutional first principles and that *Griffin* is binding precedent that "displace[s]" our more recent case law. Although *Griffin* focused on *Strickland*'s prejudice prong, it never expressly considered the effect a commutation might have on the prejudice evaluation. At best, *Griffin* can be read to imply that any sentence other than death satisfies the prejudice prong. *Richardson* and *Mertz*, on the other hand, expressly considered the effect of a commuted death penalty. Together, those cases hold that to establish prejudice, the petitioner must prove there is a reasonable probability that, but for counsel's unprofessional errors, the petitioner would have received less than the commuted sentence.

We reaffirm that rule today. A defendant whose death sentence is commuted to life imprisonment must show not only a reasonable probability that the jury would not have found death to be the appropriate sentence, but also a reasonable probability that the judge would have sentenced him to a term more favorable than life imprisonment.

### C. Prejudice Prong

AEDPA deference applies, and we have clarified the proper prejudice inquiry after a commutation. We turn now to the merits of Westray's *Strickland* claim, and first evaluate whether he was prejudiced by the alleged ineffectiveness of his trial counsel. Specifically, the question is whether Westray would have been sentenced to a term of years, rather than life imprisonment, but for his trial counsel's allegedly deficient performance.

As stated above, our decision is subject to AEDPA deference. When applying that deference to an ineffective assistance of counsel claim such as this, "[t]he federal courts as a whole engage in 'doubly deferential' review." *Wilborn v. Jones*, 964 F.3d 618, 620 (7th Cir. 2020) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). "Deference is layered upon deference in these cases because federal courts must give 'both the state court and the defense attorney the benefit of the doubt.'" *Minnick*, 15 F.4th at 468 (quoting *Titlow*, 571 U.S. at 15).

*Strickland*'s prejudice prong requires that a petitioner show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Courts assess this probability by evaluating "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh[ing] it against the evidence in aggravation." *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (per curiam) (internal quotation marks omitted) (quoting *Williams v. Taylor*, 529 U.S. 362, 397–98 (2000)).

This standard "does not require a showing that counsel's actions 'more likely than not altered the outcome,'" but the difference between the "reasonable probability" standard and the "more-probable-than-not" standard "is slight and matters 'only in the rarest case.'" *Harrington*, 562 U.S. at 111–12 (quoting *Strickland*, 466 U.S. at 693, 697). A decision is unreasonable and warrants a writ of habeas corpus only if it "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Id.* at 103.

Westray believes that with effective assistance of trial counsel, at least one juror could have been convinced not to impose the death penalty. Yet as discussed above, that is not the proper question in a commutation case. Instead, Westray must demonstrate that, but for Broeking's allegedly deficient performance, he would have received a sentence less than life imprisonment. *See Strickland*, 466 U.S. at 694; *Mertz*, 771 F.3d at 1044–45.

Westray fails to prove prejudice for several reasons. To start, Westray's codefendant Cook received a sentence of life in prison, despite entering into a negotiated plea with a significantly less egregious criminal history. This is a strong indication that a jury would have sentenced Westray to life in prison as well, regardless of Broeking's performance during the sentencing phase. Given Westray's extensive criminal history, his equal if not greater involvement in Opatt's murder, and his less favorable plea, it is difficult to conceive how Westray would have received a lighter sentence than Cook. While Cook's life sentence is not dispositive, it is strong evidence against a finding of prejudice on Westray's claim. It is thus highly unlikely, even with additional mitigating

evidence, that Westray would have been sentenced to a term of years.

Further, the quantity and nature of the aggravation evidence was overwhelming. The State presented nine witnesses during the aggravation-and-mitigation phase, most of whom focused on Westray's extensive criminal history. They testified to Westray committing multiple burglaries in his youth, as well as an attempted armed robbery that resulted in the shooting of a man and the injury of a woman. This evidence included that Westray committed two armed robberies in the two-year period before the murder of Opatt, and that Westray was planning to commit a fourth robbery afterward, for which he stated he would be willing to use lethal force. Evidence was also presented that Westray failed to comply when confronted by police, he attempted to escape from jail after his arrest, and he generally showed no remorse. Given the extent and nature of this aggravation evidence, it is very unlikely that a jury would have sentenced Westray to a term of years, even if it had heard the mitigation evidence from which Westray now seeks to benefit.

Finally, the mitigation evidence Westray says the jury should have heard was redundant. Westray contends his trial counsel should have obtained school, medical, and legal records detailing his stepfather's abuse. He further argues that trial counsel should have interviewed more family and friends, and better prepared Kern (Westray's high school friend) before putting her on the stand. Some of these alleged facts—such as trial counsel's lack of effort to investigate mitigation evidence, and his willingness to put a witness on the stand despite only being "barely acquainted" with her—are troubling. But our review at this point is confined to

*Strickland*'s prejudice prong. *Strickland*, 466 U.S. at 697. Westray's trial counsel placed three witnesses on the stand, all of whom testified about the abuse Westray suffered as a child. There is no indication that the jury did not credit this evidence. Indeed, the State did not even cross-examine these witnesses. Reports from school counselors, family friends, and legal documents corroborating the abuse of Westray may have bolstered his mitigation argument but would not have materially strengthened it. Instead, such evidence risked introducing inconsistencies, which could have undermined his witnesses' credibility.

As to Kern's testimony, it is not apparent how better preparation would have changed Westray's sentence. Among other things, Kern testified about Westray's abusive childhood and the reforms he made by becoming more involved in the drama ministry at their church. When asked if Westray had an "aptitude" for the drama ministry, she responded that he "was called to do that by God. That is his—that's what he's to be doing, is to reach people for Christ." The State asserted in its closing argument that Westray's signs of remorse were nothing more than an act. While preparation may have given the State less quotable lines, Kern's testimony was still favorable. Kern provided the jury with evidence of how Westray had reformed his life through his faith. It is unlikely that the State's argument would have materially changed, regardless of Kern's testimony. And even if the State's closing argument did change, it is unlikely to have resulted in Westray receiving a sentence of less than life in prison.

Westray has not shown that but for his trial counsel's allegedly deficient performance, he would have been sentenced to a term of years. As a result, Westray cannot prove prejudice,

and his claim for ineffective assistance of trial counsel fails. We need not also consider whether his trial counsel's performance was deficient, *Strickland*, 466 U.S. at 697, and we affirm the district court's denial of this claim.

### III.  Ineffective Assistance of Counsel on Remand

Next, we consider whether Westray is entitled to habeas relief for his claim of ineffective assistance on remand. Westray argues that Lewis, his counsel on remand, did not raise Broeking's ineffectiveness in the amended motion to withdraw guilty plea. Again, we review "a district court's denial of a petition for habeas corpus *de novo* and findings of fact for clear error." *Felton*, 926 F.3d at 464 (citation omitted).

Both parties agree that this second *Strickland* claim rises and falls with Westray's first *Strickland* claim. The district court rejected this second claim, stating that counsel "did in fact raise the issue" in the amended motion to withdraw guilty plea, which states that Westray "was denied the effective assistance of trial counsel, because trial counsel failed to conduct a reasonable investigation into mitigation evidence and circumstances of the Defendant." The court dismissed this ground for relief because it was factually incorrect and Westray offered no reasoned explanation for his argument.

We agree with the district court that Lewis raised Broeking's alleged ineffectiveness in the amended motion to withdraw Westray's guilty plea. As discussed above, the amended motion's second claim states that trial counsel "failed to conduct a reasonable investigation into mitigation evidence and circumstances" of Westray. Lewis raised the exact claim Westray now argues he is ineffective for having failed to raise. His argument is thus factually inaccurate.

Further, the claim that Lewis was ineffective on remand necessarily fails because the underlying claim for ineffective assistance of trial counsel fails. Simply put, Lewis cannot be ineffective for failing to raise what would have been an unsuccessful ineffective assistance of counsel claim. We agree with both advocates in this case—the two *Strickland* claims rise and fall together. Because Broeking was not ineffective, Lewis also was not ineffective. The district court correctly denied this second ineffective assistance of counsel claim.

## IV. Evidentiary Hearing

Finally, we consider the district court's denial of Westray's motion for an evidentiary hearing. We review a "district court's denial of a habeas petitioner's request for an evidentiary hearing for an abuse of discretion." *Coleman v. Hardy*, 628 F.3d 314, 318 (7th Cir. 2010) (citation omitted). The "AEDPA governs the availability of evidentiary hearings on federal habeas review, and generally bars them except in narrow exceptions." *Ward v. Jenkins*, 613 F.3d 692, 698 (7th Cir. 2010).

Review "under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181. In other words, "no federal evidentiary hearing is permitted when the state court has already addressed the issue; rather, 'the record under review is limited to … the record before the state court.'" *Stechauner v. Smith*, 852 F.3d 708, 721 (7th Cir. 2017) (alteration in original) (quoting *Pinholster*, 563 U.S. at 182). If the AEDPA poses no bar to an evidentiary hearing, then the petitioner is entitled to a hearing in federal court "if (1) he has alleged facts which, if proved, would entitle him to habeas relief and (2) the state courts, for reasons beyond his control, never considered his claim in a full and fair hearing." *Ward*, 613 F.3d at 698

(citations omitted). But "[i]f a claim has been adjudicated on
the merits by a state court, a federal habeas petitioner must
overcome the limitation of § 2254(d)(1) on the record that was
before that state court." *Pinholster*, 563 U.S. at 185.

As discussed above, the state court adjudicated Westray's
ineffective assistance of trial counsel claim on its merits. *See
Harrington*, 562 U.S. at 99. The AEDPA therefore bars an evi-
dentiary hearing. *See Stechauner*, 852 F.3d at 722. The analysis
need go no further. Westray "must overcome the limitation of
§ 2254(d)(1) on the record that was before that state court."
*Pinholster*, 563 U.S. at 185. A "straightforward application of
*Pinholster* precludes an additional evidentiary hearing in this
case," so we affirm the district's denial of an evidentiary hear-
ing. *Stechauner*, 852 F.3d at 722.

*        *        *

For these reasons, we AFFIRM the district court's judgment.